Frank Henry **MARSHALL**, Appellant,

v.

**STATE of Alaska, Appellee.**

No. A–9721.

Court of Appeals of Alaska.

Dec. 24, 2008.

---

G. Blair McCune, Anchorage, and Frank Henry Marshall, in propria persona, Seward, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Col-

berg, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

On November 25, 2003, Frank Henry Marshall handed nineteen 40–milligram Oxycontin pills to an undercover police officer in exchange for $600 cash. This transaction ultimately led to Marshall's conviction at trial on one count of second-degree misconduct involving a controlled substance.[1]

Marshall raises several issues in this appeal. He contends that the superior court erred when it rejected his entrapment claim without providing him an evidentiary hearing. We conclude that the superior court properly denied Marshall's claim without a hearing.

Marshall next contends that the superior court erroneously denied his motion to suppress evidence the police seized from the truck in which he was a passenger when he exchanged the nineteen pills for the $600 cash. We conclude that Marshall lacked standing to object to the entry into the truck and the seizure of the cash and a pill found on the floor because he had no reasonable expectation of privacy to assert in the pill and the cash seized. With regard to a bag of drug prescriptions found in the dash, although Marshall may have had a subjective expectation of privacy in the bag and its contents, the bag and some of the contents were visible, and the character of the bag and contents as evidence of the recently completed drug transaction was readily apparent.

Marshall attacks the superior court's evidentiary ruling permitting the State to admit evidence that Marshall possessed other controlled substances when he was arrested. On appeal, the State agrees with Marshall that the evidence should have been excluded, but argues that the admission of this evidence was harmless. We question whether we should accept the State's concession of error, particularly in light of the defense

Marshall advanced at trial—Marshall argued that the State had not proven beyond a reasonable doubt that he knew that he was exchanging the nineteen Oxycontin pills he handed the undercover officer for $600 cash. His collection of prescriptions, pills, and pill bottles is seemingly relevant to his general knowledge of prescription pills and the identity of the pills he transferred to the officer. Even so, we conclude that if the admission of this evidence was error, the error was harmless.

Shortly before trial, the prosecutor and one of the police officers interviewed Robert Clossey, an informant and the driver of the truck when Marshall exchanged the pills for cash. Because the prosecutor recorded the interview, the recording was discoverable under Alaska Criminal Rule 16(b)(1)(A)(i) since it was a recorded statement of a witness. The prosecutor provided this discovery during trial. We conclude that the superior court did not abuse its discretion when it rejected Marshall's request for a mistrial or his alternative request for a continuance.

Marshall, who was granted co-counsel status on appeal, raises several pro se claims. We reject his claims that he was entitled to dismissal of the charges because he did not receive a preliminary hearing, that he was arrested without probable cause, that the police wrongfully listened to the transaction using a "safety wire" without a warrant, that he was subject to vindictive or selective prosecution, and that he was not afforded a speedy trial.

Because Marshall was a second felony offender for purposes of presumptive sentencing, he faced a 10–year presumptive term. Marshall proposed several statutory mitigating factors, but the superior court concluded that Marshall had not met his burden of proof on those factors. After reviewing the sentencing record, we uphold the superior court's rejection of the mitigators.

Marshall also contends that his sentence is excessive. But the Superior Court was not authorized to reduce the presumptive term in the absence of mitigating factors, and Mar-

---

1. AS 11.71.020(a)(1) (delivery of a schedule IA    controlled substance, Oxycodone).

shall did not argue that the case should be referred to the three-judge sentencing panel. Accordingly, we affirm Marshall's conviction and sentence.

### Background facts

Robert Clossey and his companion, Margaret Purcell, both police informants, learned that Marshall wished to sell Oxycontin that he obtained with a prescription. They arranged for Marshall to make a sale to an undercover police officer.

Clossey and Purcell were informants because both were arrested for selling Oxycontin to undercover police in April 2002. Both agreed to help the police in the hope of favorable treatment. Police struck a deal with Clossey and Purcell, explaining that they could avoid prosecution or receive mitigation if they acted as informants; specifically, if they contacted police to set up undercover drug buys with people selling Oxycontin or cocaine.

On November 24, 2003, approximately fifteen months after her arrest for selling Oxycontin, Purcell contacted Officer Steve Haas to report that a man named Frank Marshall had a prescription for Oxycontin and wanted to sell some pills. That same day, Clossey was unsuccessful in his attempt to reach his contact, Detective Jason Penman of the Anchorage Police Department Metro Drug Unit. Because Clossey and Purcell believed Marshall to be homeless and that it might be difficult to find him later, they invited him to eat dinner at their house and stay the night.

The next day, Clossey reached Penman and told him that Marshall wanted to sell a portion of his Oxycontin prescription. Penman decided that while undercover, Haas would buy twenty Oxycontin pills from Marshall for $600. Clossey agreed to drive Marshall to a parking lot on Tudor Road to complete the transaction. Marshall filled his Oxycontin prescription that same day—November 25.

Police had not met with Clossey before he drove Marshall to the agreed-upon location. When Clossey pulled into the parking lot, Haas approached the passenger side of Clossey's truck. Clossey did most of the talking, announcing the terms of the sale out loud. Marshall then handed Haas nineteen pills in exchange for $600 (the sale was intended to be for twenty pills, but a single pill was later found on the floor of Clossey's truck).

After the exchange, Clossey and Marshall drove away. Immediately afterwards, two patrol cars, one driven by Anchorage Police Sergeant Roy LeBlanc and the other by Officer Jeff Bell, surrounded Clossey's truck. In an effort to conceal Clossey's role, the police arrested and searched him along with Marshall. Bell seized prescription pill bottles for Oxycontin, hydrocodone, and diazepam from Marshall. There were twenty-eight pills of Oxycontin remaining from Marshall's sixty-pill prescription, and eighty pills of hydrocodone remaining in a one-hundred-and-eighty-pill prescription bottle. LeBlanc then searched Clossey's truck and found two purple bags containing prescription receipts and documents with Marshall's name on them, one pill of Oxycontin on the floor of the passenger's side, and the $600 cash hidden in the springs of the passenger's seat cushion.

Detective Penman interviewed Marshall at the station and recorded that interview. During the interview, Marshall denied any wrongdoing.

The grand jury charged Marshall with two counts of second-degree misconduct involving a controlled substance and one count of third-degree misconduct involving a controlled substance. The first count of second-degree misconduct charged Marshall for the delivery of nineteen Oxycontin pills to the undercover officer in exchange for $600. The second charged Marshall with intending to deliver the remaining Oxycontin pills in his prescription that were found with him when he was arrested. And the count for third-degree misconduct charged Marshall with intending to deliver pills from his remaining supply of prescriptions that were found with him when he was arrested: specifically, hydrocodone. The superior court granted Marshall's motion to dismiss the charge of third-degree misconduct, and Marshall proceeded to trial on the second-degree misconduct charges. The jury convicted Marshall on the first of these charges, and acquitted him on second.

*Why we uphold the superior court's decision to deny a hearing on Marshall's entrapment claim*

■ Marshall filed a motion asking the superior court to dismiss the charges against him on the theory that he had been entrapped. The superior court denied this motion without holding an evidentiary hearing. On appeal, Marshall argues that it was error for the superior court to rule on the entrapment motion without first holding an evidentiary hearing.

In his motion, Marshall's theory of entrapment was that the Oxycontin pills delivered to the police officer did not actually belong to Marshall; instead, he maintains that the pills were the property of Clossey. Marshall thus suggested that the State's evidence on this point (that is, that the pills belonged to Marshall) was not conclusive. He argued that the evidence was at least arguably consistent with the theory that Clossey supplied the pills, and that Marshall's only involvement in the transaction was that Clossey passed the pills to Marshall so that he could then hand the pills to the undercover officer (the purported purchaser).

These assertions, if proved, would establish entrapment under the *Bueno* theory of entrapment. This doctrine, first announced in *United States v. Bueno*,[2] holds that it is entrapment for the police to set up a drug deal by supplying their informant with drugs, arranging the "sale" of these drugs to another undercover officer, and then having the informant induce the defendant to act as the middleman in the transaction.

However, the *Bueno* doctrine is no longer part of the federal law of entrapment, and it is unclear whether the Alaska law of entrapment includes the *Bueno* doctrine.

Five years after it was announced, the *Bueno* theory of entrapment was rejected by the United States Supreme Court as being inconsistent with the federal approach to that doctrine, which hinges on a defendant's subjective willingness to engage in criminal conduct.[3] That same year, in *Evans v. State*,[4] the Alaska Supreme Court indicated that the *Bueno* theory of entrapment was "quite compatible" with Alaska's objective approach to entrapment, but the supreme court did not decide whether to adopt the *Bueno* doctrine as a matter of state law (because, even under the *Bueno* doctrine, the facts of *Evans* did not establish entrapment).

And in *Bush v. State*,[5] this court stated that the *Bueno* theory of entrapment "seems to have been adopted by Alaska" because the supreme court referred to this theory approvingly in *Evans* and later in *Coffey v. State*.[6] However, we now rescind that assertion. Neither *Evans* nor *Coffey* explicitly adopts the *Bueno* theory of entrapment, and this issue remains undecided in Alaska.

To resolve Marshall's case, however, we need not decide whether to adopt the *Bueno* doctrine, because we conclude that Marshall failed to make a sufficient offer of proof to support his assertion of entrapment.

Marshall's theory of entrapment hinges on the factual assertion that the Oxycontin pills did not come from him (even though he had a prescription for these pills), but rather were supplied by Clossey. Marshall did not submit any affidavits, police reports, or other materials to support this factual assertion. He simply based his argument on the assertion that the State's description of events did not completely rule out the possibility that the pills were supplied by Clossey.

When the State filed its opposition to Marshall's motion, one of the State's primary arguments was that Marshall's pleading was insufficient because its facts were unsupported by affidavit or other evidence. In particular, the State argued that Marshall was obligated to provide some modicum of evidence to support his primary assertion of fact—that Clossey supplied the Oxycontin—before Marshall would be entitled to an evidentiary hearing on his entrapment motion.

**2.** 447 F.2d 903, 905–06 (5th Cir.1971).

**3.** *Hampton v. United States*, 425 U.S. 484, 489–90, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976).

**4.** 550 P.2d 830, 844–45 (Alaska 1976).

**5.** 678 P.2d 423, 424–25 (Alaska App.1984).

**6.** 585 P.2d 514, 521–22 (Alaska 1978).

Despite the State's position on this issue, when Marshall filed his reply to the State's opposition, he did not provide any affidavit or other evidence to support his assertions of fact. The superior court denied Marshall's entrapment motion without holding a hearing. On the specific issue of who supplied the Oxycontin, the court wrote:

> Marshall bears the burden of establishing entrapment[,] and his assertions that the state has failed to prove that the Oxycontin was Clossey's [ ] do not meet this burden. Marshall's speculation about the source of the Oxycontin is contradicted by the fact that Marshall was in possession of a prescription for [this] drug[,] and that it was Marshall who held the drugs in his hand and took the money from Officer Haas....
>
> . . . .
>
> ... Marshall has shown nothing more than that Clossey informed [the] police of Marshall's willingness to sell Oxycontin. Accordingly, the ... motion to dismiss for entrapment and [the] request for [an evidentiary] hearing is DENIED.

In *Adams v. State*,[7] and again in *Davis v. State*,[8] this court addressed the question of when a trial court is required to hold an evidentiary hearing on pretrial motions. As we explained in *Davis*:

> [T]he moving party bears the initial burden of alleging specific facts, *supported by affidavits or other documents,* that would entitle the party to relief.... Only [when] the pleadings [present] a genuine dispute as to material facts is an evidentiary hearing required.[9]

In this case, Marshall raises the claim of entrapment. As the superior court noted in its decision, it was therefore his burden to present a prima facie case for relief. And as the superior court also noted, Marshall could not establish a prima facie case by merely making "assertions that ... the Oxy[c]ontin was Clossey's" or by presenting "speculation about the source of the Oxy[c]ontin." In-

stead, Marshall was obligated to offer affidavits, prior testimony, or other documents to support his underlying assertion that Clossey was the source of the drug.

This court recently confronted an analogous issue in *LaBrake v. State*.[10] *LaBrake* involved a petition for post-conviction relief based on an assertion of ineffective assistance of counsel. The question was whether the superior court acted properly when it dismissed LaBrake's petition without holding an evidentiary hearing.

In arguing that the superior court should hold a hearing on his claims, LaBrake relied on the general principle that when a court assesses whether to grant judgment on the pleadings or summary judgment to a party, it assumes the truth of all well-pleaded assertions of fact made by the non-moving party.[11] But as we explained in *LaBrake,* the rule that a court must assume the truth of the non-moving party's assertions of fact does not apply to "statements concerning the law, or concerning mixed questions of law and fact (*e.g.,* ... assertions concerning the legal effect or categorization of the underlying occurrences), nor does the presumption apply to ... conclusory ... *pro forma* assertions of the ultimate facts to be proved when these assertions are not supported by specific details."[12]

In the present case, Marshall made assertions about an ultimate fact to be proved (that Clossey was the one who supplied the Oxycontin), but he did not support this assertion with details or offer any evidence to support this assertion. Rather, Marshall relied solely on the fact that the existing record did not necessarily rule out this possibility. Under Alaska law, this was not sufficient to avoid a summary ruling against him.

In his brief to this court, Marshall acknowledges this case law, but he argues that it applies only to pretrial motions, and not to affirmative defenses. Marshall contends that

---

**7.** 704 P.2d 794, 796–97 (Alaska App.1985).

**8.** 766 P.2d 41, 43–45 (Alaska App.1988).

**9.** *Id.* at 43 (emphasis added).

**10.** 152 P.3d 474 (Alaska App.2007).

**11.** *Id.* at 480.

**12.** *Id.* at 481 (citing 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1368, at 255 (3d ed.2004)).

once a defendant complies with Alaska Criminal Rule 16(c)(5) by giving pretrial notice that he will rely on the defense of entrapment, the defendant is then automatically entitled to an evidentiary hearing on that defense even if he has offered no evidence to support it.

We do not believe that Criminal Rule 16(c)(5) was meant to supersede the established law on the litigation of pretrial motions and other claims for relief. Rule 16(c)(5) was intended to give the State advance notice that certain types of claims—"alibi, justification, duress, entrapment, or [any] other statutory or affirmative defense" [13]—would be raised in the defendant's case. But Rule 16(c)(5) was not intended to exempt the defendant from presenting evidence to support the claimed defense.

When the announced defense is one that must be litigated to the jury, the fact that a defendant has given pretrial notice of that defense under Rule 16(c)(5) does not exempt him from the rule that, if there is no evidence offered to support each element of the proposed defense, a trial judge need not instruct the jury on that defense (that is, need not ask the jury to decide it).[14]

And when the announced defense is one that is litigated to the court—such as entrapment—this request for relief is governed by the same rule that applies to other requests for relief addressed to the court: The court is not obligated to hold an evidentiary hearing on the defendant's claim unless that claim is supported by a proper offer of proof. In Marshall's case, he failed to offer any evidence to support a crucial assertion of fact: his assertion that the Oxycontin was Clossey's. Accordingly, the superior court could reject Marshall's claim of entrapment summarily, without holding an evidentiary hearing.

*Marshall's claim that the police illegally seized evidence from the truck*

■ Marshall moved to suppress certain evidence seized from Clossey's truck: a bag with prescriptions, the Oxycontin pill found on the passenger floor, and the $600 cash found under the passenger seat. Marshall claimed that the warrantless search of the truck did not fall into any exception to the warrant requirement because the truck could have been secured while a warrant was obtained. To make such a claim, Marshall maintained that he had a privacy interest in the articles seized by the police and, therefore, had standing to contest the search.

Superior Court Judge Philip R. Volland denied this motion. Relying on *Waring v. State*,[15] the superior court ruled that Marshall did not have standing to contest the seizure of the three items identified in his motion. In *Waring*, the Alaska Supreme Court held that the adoption of the exclusionary rule in Evidence Rule 412 did not eliminate the standing requirement for the assertion of a search and seizure claim.[16] The court expanded the standing requirement from *Rakas v. Illinois*,[17] which barred a defendant from vicariously claiming the violation of a codefendant's Fourth Amendment right, by allowing a defendant to assert the violation of a codefendant's Fourth Amendment right if the defendant can show (1) that a police officer obtained the evidence as a result of gross or shocking misconduct, or (2) that the officer deliberately violated a codefendant's rights.[18]

We uphold Judge Volland's decision. Even assuming that the police violated Clossey's privacy interests when they searched his truck (the State asserts that Clossey consented to a search of his truck) the record contains no basis to find that the police engaged in gross or shocking misconduct when they searched the truck and found the prescription bag, a single Oxycontin pill, and

13. Alaska R.Crim. P. 16(c)(5).

14. *See State v. Garrison*, 171 P.3d 91, 94 (Alaska 2007); *Ha v. State*, 892 P.2d 184, 190 (Alaska App.1995).

15. 670 P.2d 357, 360–63 (Alaska 1983).

16. *Id.* at 361.

17. 439 U.S. 128, 132–34, 99 S.Ct. 421, 424–25, 58 L.Ed.2d 387 (1978).

18. *Waring*, 670 P.2d at 363.

$600. Nor is there any basis in the record to find that the police deliberately violated Clossey's rights. After all, Clossey was a cooperating informant. Furthermore, Marshall did not claim a possessory interest in the $600 cash or the single pill found on the floorboard. Marshall was a guest in Clossey's truck, and presumably chose to place the prescription bag in the dash of the truck where it was found by the police. Under the standing requirement established in *Waring*,[19] Marshall does not have standing to argue that the police illegally entered Clossey's truck or illegally seized the cash and the pill that Marshall did not claim was his. As for the prescription bag found in the dashboard of Clossey's truck, it was in plain view and was evidence of the crime.

Because we agree that Marshall does not have standing to contest the entry into the truck in which he claimed no interest, we need not consider the State's alternate claim that the search of the truck was justified as a search incident to Marshall's arrest.

*Why we uphold the superior court's ruling on the State's discovery violation*

■ Shortly before Marshall's trial, the prosecutor interviewed Clossey and electronically recorded that session. During the interview, Clossey described certain statements that Marshall had made. The prosecutor, however, did not disclose this interview until after Marshall's trial had already begun.

Shortly after this interview was belatedly disclosed, the defense attorney moved for a mistrial. She contended that the prosecutor had violated Alaska Criminal Rule 16 and that Marshall's defense had been prejudiced by the interview's late disclosure, noting that she had already delivered her opening statement. She argued that the recorded interview with Clossey was inconsistent with the theory of defense she had presented in this opening statement. Hence, her opening

statement would have been different if the recorded interview had been disclosed in a timely fashion (or at least before the trial started). The defense attorney also argued that her cross-examination of Clossey would not be as effective, because she would not have adequate time to investigate and prepare for the information contained in the interview.

Because the prosecutor's interview with Clossey was recorded, the State was obliged to disclose the interview under Criminal Rule 16(b)(1)(A)(i), which requires disclosure of "written or recorded statements" of witnesses. In addition, even if the interview had not been recorded, the State would have had to disclose the portions of the interview in which Clossey described statements made by Marshall under Criminal Rule 16(b)(1)(A)(ii), which also requires disclosure of "the substance of any oral statements made by the accused."[20]

When Marshall requested the mistrial, the prosecutor conceded that the State had violated Criminal Rule 16 by not disclosing the interview earlier. However, the State opposed a mistrial, arguing that the late disclosure could be cured by a continuance or by a limitation on the State's presentation of the information contained in the interview.

In response to the motion for mistrial, Superior Court Judge John E. Suddock concluded that the information contained in the recorded interview was not inconsistent with Marshall's announced defense, and he further concluded that Marshall would not be prejudiced by the lack of advance notice if limitations were placed on the State's introduction of some of the information contained in the interview (in particular, Clossey's assertions that he had not used illicit drugs since his arrest two years before, and that he was instead taking methadone). For these reasons, Judge Suddock denied Marshall's request for a mistrial.

19. *Id.*

20. *See also* American Bar Association, *Standards for Criminal Justice: Discovery and Trial by Jury* § 11–2.1(a)(ii) cmt., at 11·20 (2d ed. 1980) ("[T]he discoverability of the [defendant's] statement does not depend upon its written or oral

form.... For example, the statement is discoverable even if made before or during the alleged offense, [or] even if exculpatory, [or] even if made to a third party rather than to prosecution or police personnel.").

On appeal, Marshall renews his contentions that he was prejudiced by the late disclosure in two ways: first, because the information contained in Clossey's interview undercut the theory of the case that Marshall's attorney had announced in her opening statement; and second, because Marshall's attorney could not realistically prepare in the middle of trial to cross-examine Clossey about the information disclosed in the interview.

(We note that Marshall does not argue that he was prejudiced by the State's violation of Rule 16(b)(1)(A)(ii)—that is, by the late disclosure of the statements attributed to him by Clossey. Rather, Marshall's arguments on appeal rest solely on the fact that the State violated Rule 16(b)(1)(A)(i)—by not disclosing a recorded statement of a witness.)

We turn first to the issue of whether the late disclosure undercut Marshall's opening statement. In that opening statement, Marshall's attorney outlined the theory that Clossey had used Marshall as "window dressing." Essentially, she meant that Clossey had set Marshall up to be a scapegoat in the drug transaction so that Clossey could portray himself as a productive informant who should be allowed to remain at liberty and not be prosecuted for his own crimes.

Marshall argues that this theory was undercut by Clossey's statements in the recorded interview that Clossey had stopped using illegal drugs and switched to methadone under a doctor's care. Marshall contends that his "window dressing" theory of defense depended on the assertion that Clossey was the true source of the Oxycontin, and that this assertion was inconsistent with Clossey's statement that he was on methadone and no longer used any non-prescribed drugs.

But as Judge Suddock correctly noted, Marshall's opening statement did not contain an explicit assertion about the origin of the nineteen pills that Marshall gave to the undercover officer for $600 cash. In other words, the "window dressing" theory of the case could remain essentially the same regardless of whether Clossey coaxed Marshall into selling a portion of his own prescription for Oxycontin, or whether Clossey had a supply of Oxycontin from some other source.

Similarly, Judge Suddock perceived the possibility that Clossey's assertions about confining himself to methadone, and not using illicit drugs, could potentially undercut the argument that Clossey was the source of the Oxycontin. For this reason, the judge correctly prohibited the State from introducing testimony on this particular aspect of Clossey's interview (unless, of course, Marshall took some affirmative step to "open th[e] door" to this subject).

Because of this measure by Judge Suddock, we agree with him that, under these circumstances, the late disclosure of the Clossey interview did not undercut the theory presented in Marshall's opening statement.

Marshall's second main argument is that, without a mistrial, he was unable to effectively prepare to meet the information disclosed in the Clossey interview. Marshall focuses in particular on Clossey's statements that he was taking methadone, that he had stopped using any non-prescribed drugs, and that he had turned his life around.

But as explained above, Judge Suddock barred the State from eliciting testimony about Clossey's regimen of methadone. We note, moreover, that during her cross-examination of Clossey, Marshall's attorney elicited the fact that three doctors had "fired" Clossey as a patient because of accusations that he was selling drugs he obtained from these doctors by prescription—events that occurred *after* Clossey was arrested and agreed to cooperate with the police. And the defense attorney elicited testimony from Clossey that in that same time period he had been prescribed oxycodone (the active ingredient in Oxycontin), hydrocodone, and diazepam. And, of course, the defense attorney focused on the fact that Clossey faced potential prosecution and imprisonment if, after agreeing to work as a police informant, he failed to live up to their expectations.

In light of such testimony, we agree with Judge Suddock that the record fails to establish that Marshall suffered the kind of prejudice that would warrant a mistrial. And, for these reasons, we conclude that Judge Suddock did not abuse his discretion when he

ruled that the State's untimely disclosure of the Clossey interview did not require a mistrial.

*Marshall's attack on the court's Evidence Rule 404(b) ruling*

When the police arrested Marshall, they seized prescription bottles containing Oxycontin, hydrocodone, and diazepam. There were twenty-eight pills of Oxycontin remaining in one prescription bottle (out of a sixty-pill prescription), and eighty pills of hydrocodone remaining in another (out of a one-hundred-and-eighty-pill prescription).

Marshall was originally indicted on two counts of second-degree misconduct involving a controlled substance and one count of third-degree misconduct involving a controlled substance.[21] The first count of second-degree misconduct involving a controlled substance was for the nineteen pills Marshall exchanged with Haas; the second count of second-degree misconduct was for the twenty-eight pills police seized from Marshall when they arrested him; and the third count, of third-degree misconduct, was for the hydrocodone pills found on Marshall's person.

Marshall moved to dismiss this last count for third-degree misconduct, and Judge Volland found that insufficient evidence was presented to support it because there was no evidence that Marshall intended to illegally deliver the hydrocodone pills. And Judge Volland ruled that no inference could be drawn from the first two counts—based on his sale of Oxycontin pills to police and the remaining pills in the prescription bottle— because Clossey's dealings with the State were based solely on Oxycontin. Judge Volland dismissed this count just before trial, and the State filed a notice of intent to offer the hydrocodone evidence under Alaska Evidence Rule 404(b).

The State asserted that it had evidence that Marshall delivered hydrocodone to another person the day before his arrest. The State also asserted that it could produce an expert who would testify that, between the time that Marshall filled the hydrocodone

prescription the day before his arrest and the time that he was arrested, he could not have safely ingested the one hundred pills that were missing from his prescription bottle. The State contended that this evidence was relevant to prove Marshall's intent, motive, and plan to deliver more of the prescription pills in his possession. The State claimed that it needed to introduce this evidence to counter Marshall's expected argument that the State could not prove that he intended to deliver the remaining Oxycontin pills charged in second count of second-degree misconduct.

The State advanced the same argument regarding the diazepam: Marshall filled a ninety-pill prescription the day before his arrest, but had only sixty-eight pills when he was arrested.

In response, Marshall argued that no reasonable inference of his intent to sell the remaining Oxycontin pills in his possession could be drawn from the hydrocodone and diazepam he possessed. Judge Suddock rejected this argument and found the evidence relevant to Marshall's state of mind.

During the trial, Marshall renewed his objection to the admission of this evidence, arguing that the evidence should be excluded under Alaska Evidence Rule 403. Marshall argued that the evidence was confusing, irrelevant, and prejudicial—pointing out that the court had dismissed the count charging him with intending to deliver the hydrocodone—and contended that the possession of a legal prescription, without more, offered no reasonable inference of an intent to sell. Nevertheless, Judge Suddock found that the evidence was relevant, that any confusion could be cured without precluding submission of the evidence, and that the evidence was not unduly prejudicial.

On appeal, the State concedes that the hydrocodone and diazepam evidence should have been excluded under Rule 403. But the State argues that admitting the evidence was harmless error under *Love v. State*[22] because Marshall was acquitted on the count alleging that he intended to deliver the remaining Oxycontin pills in his possession.

---

**21.** AS 11.71.020(a)(1) and AS 11.71.030(a)(1), respectively.

**22.** 457 P.2d 622, 634 (Alaska 1969).

The State points out that while this evidence satisfies the first requirement announced in *Clark v. State*[23] for evidence offered as proof of intent under Evidence Rule 404(b)(1)—that to admit other conduct evidence to show intent requires that intent be contested—the evidence fails to satisfy the second requirement—that the other conduct be similar to the charged conduct.[24] The State claims that the "other conduct" is dissimilar because, while "Marshall's intent regarding the [Oxycontin] pills remaining in his possession could be readily inferred from his having actually delivered the nineteen pills to Officer Haas," Marshall's "mere possession of some portion of his other prescriptions does not reflect on his intent with respect to the [Oxycontin] that remained in his possession."

But we question whether the State's concession that the evidence should have been excluded is well-taken, particularly in light of Marshall's defense.[25] Marshall did not attack the evidence of his actus reus for the count charging the in-hand delivery to the undercover officer. Instead, he contended that the State could not prove beyond a reasonable doubt that he knowingly delivered Oxycontin to the undercover officer, and further suggested that these pills came from Clossey.

Clossey testified that Marshall went to Clossey's house and told Clossey that he needed money and was willing to sell some of his prescriptions. Clossey further testified that he never touched the pills delivered to the undercover police officer or the cash given in exchange. The rapid depletion of the other prescriptions, combined with Marshall's willingness to sell the Oxycontin, as was confirmed by Clossey's and Purcell's testimony, supported the State's claim that Marshall engaged in a knowing delivery.

However, even if it was error to admit this evidence, we conclude the error was harmless. The jury acquitted Marshall of possessing the balance of the Oxycontin with intent to sell. Both Haas and Clossey testified that Marshall gave Haas the pills in exchange for the cash from Haas. The Oxycontin prescription was in Marshall's possession when he was arrested and the police found the $600 cash under Marshall's seat. Marshall himself had filled his Oxycontin prescription the same day as his arrest. From our review of the record, we conclude that any arguable error in admitting the challenged evidence was unlikely to have affected the verdict.[26]

### Why we reject Marshall's pro se claims

◼ Marshall argues that his case should be dismissed because the court did not conduct a preliminary hearing under Alaska Criminal Rule 5. In *Sproates v. State*,[27] we recognized that, under Criminal Rules 5(e) and 5.1, ten days is the upper limit on the length of time that an arrestee may be held in custody before indictment or a preliminary examination.[28] Marshall was held beyond that limit; under *Sproates*, the remedy for this violation was to discharge Marshall, but not to dismiss the charges.[29] Because Marshall was indicted on December 5, 2003, the issue of the violation of Criminal Rule 5 was mooted.

Marshall next claims that Clossey and Haas solicited his participation in the delivery in violation of AS 11.31.110(a). But to the extent that the police and informants set up drug transactions, their conduct is justified.

◼ Additionally, Marshall argues that he was arrested without probable cause. This claim appears to be based on the fact that the police did not obtain a *Glass* warrant to electronically monitor and record the trans-

---

**23.** 953 P.2d 159 (Alaska App.1998).

**24.** *Id.* at 162.

**25.** *See Marks v. State,* 496 P.2d 66, 67–68 (Alaska 1972) (holding that in criminal cases, an appellate court must independently evaluate the government's concession of error).

**26.** *Cf. Love,* 457 P.2d at 629–31.

**27.** 81 P.3d 301 (Alaska App.2003).

**28.** *Id.* at 301–03.

**29.** *Id.* at 303–04.

action.[30] Marshall claims that no *Glass* warrant was secured because police did not have the probable cause necessary to secure it. And he argues that police could not monitor the transaction with a "safety wire" unless they had a *Glass* warrant.

We reject Marshall's claim. Marshall's delivery of the pills to Haas in exchange for $600 cash established probable cause for Marshall's arrest. And Marshall has provided no authority that the use of a "safety wire" violates *Glass* so long as the State does not rely on a recording produced with the use of that safety wire.

Marshall also believes that he has been subject to a vindictive prosecution. He objects to Clossey's favorable treatment, refers to being entrapped and the claim that there was a lack of probable cause against him, and argues that he was overcharged. However, the count for third-degree misconduct involving a controlled substance was ultimately dismissed and he was acquitted of one count of second-degree misconduct. Consequently, any "overcharging" that occurred would be moot.

Similarly, Marshall argues that it was prosecutorial misconduct for the State to move to enter the hydrocodone and diazepam evidence as Rule 404(b) evidence after the count for third-degree misconduct was dismissed. But we concluded above that any error in admitting this evidence was harmless.

And again, Marshall repeats his claim that the court erred in denying him a hearing on entrapment. But we upheld the superior court's denial of a hearing above.

■ Marshall also contends that the court erred in allowing a speedy-trial violation. But in Marshall's opening brief, he did not discuss this issue in the argument section of his brief, and only mentions the point in one

sentence in its conclusion. ("Criminal Rule 45 and Mr. Marshall's constitutional right to a speedy trial were violated under the [Six]th Amendment to the United States Constitution.") And in the brief he did not discuss, let alone analyze, the superior court's ruling denying his speedy-trial claim. This is inadequate briefing.[31]

*Why we reject Marshall's attack on his sentence*

■ Marshall was convicted of second-degree misconduct involving a controlled substance, a class A felony.[32] Because Marshall was a second-felony offender, he faced a presumptive 10–year term under the pre-March 2005 sentencing code.[33]

Marshall contended three statutory mitigating factors applied: (1) AS 12.55.155(d)(9) (his conduct in committing the offense was among the least serious within the definition of the offense); (2) AS 12.55.155(d)(13) (the harm caused by his crimes has been consistently minor and inconsistent with a substantial period of imprisonment, now numbered (d)(12) in the current code); and (3) AS 12.55.155(d)(14) (the offense involved a small quantity of a controlled substance, now numbered (d)(13) in the current code).

Marshall argued that his conduct was among the least serious in the definition of the offense for three reasons. First, the Oxycontin was only delivered to a police officer, and thus the pills were not released to the general public. Second, this was a single sale. Third, the pills came from a valid prescription, no weapons were involved in their delivery, the police decided their quantity and price, Marshall never attempted to escape, and he did not have any items commonly used by drug dealers, that is, he did not possess any cell phones, pagers, paraphernalia, weapons, or packaging materials.

---

30. *See State v. Glass*, 583 P.2d 872, 881 (Alaska 1978), *modified on reh'g*, 596 P.2d 10 (Alaska 1979) (holding that the Alaska Constitution requires police to obtain judicial authorization before secretly recording a person's private conversations).

31. *See Petersen v. Mutual Life Ins. Co. of N.Y.*, 803 P.2d 406, 410 (Alaska 1990) ("Where a point

is not given more than a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

32. *See* former AS 11.71.020(c).

33. Former AS 12.55.125(c)(3).

Next, Marshall argued that the harm caused by his offenses was minor. He pointed out that his prior felony conviction was for the possession and sale of $40 of cocaine and that this conviction was 10 years old. He also added that his most recent misdemeanor convictions involved minor harm and short sentences.

Finally, Marshall argued that under *Knight v. State*,[34] his present offense involved a small quantity of a controlled substance—nineteen pills of Oxycontin. He claimed that multiple sales of Oxycontin pills were typical and contrasted this with his own conduct based on its one-time nature. He also noted how the pills were never consumed by anyone because they never made it past the police, and how he ultimately received no monetary gain from their sale.

Judge Suddock, however, found that Marshall had not met his burden of proving the mitigating factors by clear and convincing evidence. Judge Suddock found that the transaction was "a commercial deal" with "substantial monetary gain." He found that the transaction was "no more nor no less than the typical transaction," and that he could not find that the consequences of Oxycontin sales "to the buying public in Anchor-

age are consistently minor any more than we can say that the consequences of crack cocaine, the 1993 offense, are consistently minor." He likewise rejected Marshall's claim that the offense was among the least serious because the pills were delivered to an undercover officer so the pills did not get delivered to someone who would actually use the drugs.

Under AS 12.55.155(f), Marshall bore the burden or proving the mitigating factors by clear and convincing evidence. We have reviewed Judge Suddock's findings rejecting the mitigating factors, and conclude that those findings are supported by the record. Given those findings, Judge Suddock properly rejected the mitigating factors.[35]

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

**34.** 855 P.2d 1347 (Alaska App.1993).

**35.** *See Michael v. State,* 115 P.3d 517, 519 (Alaska 2005) (holding that it is a question of law whether given facts establish a statutory mitigating factor).