Justin G. LIDDICOAT, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10559.

Court of Appeals of Alaska.

Dec. 30, 2011.

---

Colleen A. Libbey, Libbey Law Offices, LLC, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

COATS, Chief Judge.

Justin G. Liddicoat was convicted of several offenses related to his assault on his former girlfriend. He was also convicted of weapons misconduct for not informing the officer who arrested him for these offenses that he was carrying a steak knife.

After the jury returned its verdicts, Liddicoat filed a motion for a new trial, asking the superior court for an evidentiary hearing on his claim that one of the jurors in his case failed to disclose in voir dire that she knew him and was biased against him. In this appeal, Liddicoat argues that the trial court should have granted his request for an evidentiary hearing on this claim. He also claims that he is entitled to reversal of his concealed weapon conviction because, he argues, a steak knife does not meet the statutory definition of a "deadly weapon." We conclude that the trial court did not err in denying Liddicoat's request for an evidentiary hearing. We also conclude that a steak knife falls within the definition of a deadly weapon. We therefore affirm Liddicoat's convictions.

### Facts and proceedings

Liddicoat was charged with second-degree assault,[1] interfering with a report of domestic violence,[2] and fourth-degree criminal mischief,[3] after he assaulted his then-girlfriend, Brenda Green, broke her cell phone, and disabled the phones in her apartment so she could not call the police. Liddicoat was also

---

1. AS 11.41.210(a)(1).

2. AS 11.56.745(a).

3. AS 11.46.484(a)(1).

charged with fifth-degree weapons misconduct[4] for not immediately informing the police officer who contacted him that he had a steak knife in his pocket.

During trial, after the State rested its case, Liddicoat moved for a judgment of acquittal[5] on the weapons misconduct charge, arguing that the steak knife the police found in his pocket was not a "deadly weapon." Liddicoat pointed out that, under the Alaska Statutes, a "deadly weapon" is defined in part as "anything designed for and capable of causing death or serious physical injury."[6] He conceded that a steak knife was capable of causing death or serious physical injury, but argued that the State had failed to show that it was designed for that purpose. Superior Court Judge William Carey denied the motion, finding that the statute specifically included knives within the definition of a deadly weapon.

The jury convicted Liddicoat of all charges. Liddicoat then filed a motion for a new trial, arguing that he had information that one of the jurors, Julia Guthrie, had failed to disclose in voir dire that she knew Liddicoat and was biased against him. Liddicoat also alleged that Guthrie impermissibly discussed the case while she served as a juror. Liddicoat asked for an evidentiary hearing on his claim of juror misconduct. Judge Carey denied the motion without prejudice, concluding that Liddicoat had not met his burden to show that he was entitled to an evidentiary hearing. Judge Carey invited Liddicoat to present additional affidavits or other evidence to support his claim, but Liddicoat instead filed this appeal.

*Why Liddicoat was not entitled to a hearing on his juror misconduct claim*

■ A two-part inquiry governs claims of juror misconduct: (1) whether the evidence establishes a serious violation of the juror's duty and, if so, (2) whether the violation deprived the complaining party of a fair trial.[7]

■ The first part of this test—whether there was a serious violation of a juror's duty—may be shown by evidence of "fraud, bribery, forcible coercion, or any obstruction of justice."[8] When a juror knows a party or witness, and is questioned about this information in voir dire, but fails to disclose this information, that conduct may amount to an obstruction of justice.[9] In *Swain v. State*,[10] we found an obstruction of justice where a juror did not reveal her friendship with the victim or the fact that she had spoken to the victim about the crime, because that conduct deprived the parties of the opportunity to challenge the juror or question her on the issue of bias.[11] In *Swain*, we relied on the supreme court's decision in *Fickes v. Petrolane–Alaska Gas Service*,[12] which similarly held that it was "tantamount to an obstruction of justice" for a juror to fail to disclose that he knew an important witness and then, during deliberations, to assure other jurors of the witness's reliability and competence.[13]

■ The second part of the test—whether the violation deprived the party of a fair trial—hinges on three considerations: (1) Would the defendant have challenged the juror if the juror had not concealed this information? (2) Was the improperly withheld information directly relevant to the decision of the defendant's case, or was

---

**4.** AS 11.61.220(a)(1)(A)(i).

**5.** Liddicoat actually moved for a directed verdict, but the court treated it as a motion for judgment of acquittal. Under Criminal Rule 29(a), "Motions for directed verdict shall not be used and motions for judgment of acquittal shall be used in their place."

**6.** AS 11.81.900(b)(17).

**7.** *Manrique v. State*, 177 P.3d 1188, 1191 (Alaska App.2008) (citing *West v. State*, 409 P.2d 847, 852 (Alaska 1966) and *Fickes v. Petrolane–Alaska Gas Service*, 628 P.2d 908, 910 (Alaska 1981)).

**8.** *Id.* (quoting *West*, 409 P.2d at 852).

**9.** *Fickes*, 628 P.2d at 910; *Soundara v. State*, 107 P.3d 290, 296–97 (Alaska App.2005); *Swain v. State*, 817 P.2d 927, 935 (Alaska App.1991).

**10.** 817 P.2d 927 (Alaska App.1991).

**11.** *Id.* at 935.

**12.** 628 P.2d 908 (Alaska 1981).

**13.** *Id.* at 910.

it instead merely collateral to the issues being litigated? and (3) Is there a reasonable possibility that the juror's withheld information affected the juror's vote? [14]

After reviewing these legal standards, Judge Carey found that Liddicoat would be entitled to a new trial if he could show that, during the jury selection process, Guthrie deliberately withheld information that she was acquainted with Liddicoat and had personal animosity toward him, because that information would likely have led Liddicoat to challenge Guthrie for cause or peremptorily. But the court denied the motion for a new trial because the affidavits submitted by Liddicoat advanced only "unverified allegations by unknown persons and innuendo," and thus did not entitle Liddicoat to an evidentiary hearing.

A court normally must grant an evidentiary hearing on a motion when the pleadings establish a genuine dispute concerning a material fact.[15] The moving party "bears the initial burden of alleging specific facts, supported by affidavits or other documents, that would entitle the party to relief." [16] Those affidavits must be based on personal knowledge and must set forth facts that would be admissible at trial.[17]

Liddicoat was represented at trial by the Public Defender Agency. Liddicoat's new trial motion alleged that the Agency had learned—from undisclosed sources—that Samantha Turley, a roommate of Julia Guthrie, purportedly had information that Guthrie knew Liddicoat from before trial and that Guthrie was biased against him. These same undisclosed sources said that Turley had reported that Guthrie impermissibly discussed the case while she was serving as a juror. An investigator with the Public Defender Agency made an appointment to interview Turley, but Turley did not show up for the interview or return later phone calls.

In opposition to the new trial motion, the State argued that Liddicoat's allegations, which were not supported by affidavits, did not establish a prima facie case of juror misconduct. In his reply to the State's opposition, Liddicoat provided two affidavits by the Public Defender Agency investigator. In one of those affidavits, the investigator recounted that Turley initially agreed to meet with her to discuss Guthrie's knowledge of, and bias against, Liddicoat, but that Turley did not show up for the interview or return subsequent phone calls. The other affidavit recounted the investigator's interview with David Guthrie, juror Guthrie's stepson, at the Ketchikan Correctional Center. David Guthrie said he had been friends with Liddicoat for eight or nine years, that he and Liddicoat spent time at Julia Guthrie's home, that Julia Guthrie knew Liddicoat, and that she did not like any of David Guthrie's friends.

In denying the motion and the request for an evidentiary hearing, Judge Carey observed that Liddicoat had not identified, or included affidavits from, any of the unnamed individuals who allegedly provided information to the Public Defender Agency about what Turley knew about Guthrie's conduct. With respect to the affidavit recounting the interview with David Guthrie, the court noted that the declarations recounted in the affidavit were hearsay and lacked specificity. Judge Carey also questioned why "Liddicoat apparently [did] not know and recognize [Guthrie] as she underwent the jury selection process and sat through a three-day trial?"

We agree with Judge Carey's conclusion that Liddicoat failed to meet his burden to show that he was entitled to an evidentiary hearing. In the absence of any admissible evidence explaining Turley's reasons for failing to cooperate with the defense investigator, no particular inference can be drawn from the fact that Turley did not show up for

14. *Manrique,* 177 P.3d at 1193.

15. Alaska R.Crim. P. 42(e)(3) ("If material issues of fact are not presented in the pleadings, the court need not hold an evidentiary hearing.").

16. *Marshall v. State,* 198 P.3d 567, 572 (Alaska App.2008) (quoting *Davis v. State,* 766 P.2d 41, 43 (Alaska App.1988), *superseded on other*

grounds by Alaska R.Crim. P. 16(c)(5)) (italics omitted).

17. *Cf. Broderick v. King's Way Assembly of God Church,* 808 P.2d 1211, 1215 (Alaska 1991); *Donnelly v. State,* 516 P.2d 396, 398–99 (Alaska 1973).

a scheduled interview or return the investigator's phone calls. And Liddicoat has not argued that an exception to the hearsay rules would permit the investigator to testify to David Guthrie's assertion that his stepmother knew Liddicoat and apparently disliked him.[18] Because Judge Carey denied the motion without prejudice, Liddicoat had the opportunity to submit additional affidavits or other evidence to support his motion. At the very least, Liddicoat could have personally submitted an affidavit explaining how he and Julia Guthrie knew each other, if in fact they did. Given these circumstances, we find no error in Judge Carey's decision to deny the motion for a new trial without a hearing.

*Why Liddicoat is not entitled to acquittal on the weapons charge*

As already discussed, the police found a steak knife in Liddicoat's sweatshirt pocket when they conducted a pat-down search of him. Liddicoat was convicted of fifth-degree weapons misconduct for not immediately disclosing to the police that he was carrying a concealed deadly weapon.

A person commits the crime of fifth-degree weapons misconduct under AS 11.61.220(a)(1)(A)(i) if the person:

(1) is 21 years of age or older and knowingly possesses a deadly weapon, other than an ordinary pocket knife or a defensive weapon,[19]

(A) that is concealed on the person, and, when contacted by a peace officer, the person fails to

(i) immediately inform the peace officer of that possession[.]

For purposes of this statute, "deadly weapon" is defined as "any firearm, or anything designed for and capable of causing death or serious physical injury, including a knife, an

axe, a club, metal knuckles, or an explosive." [20]

Liddicoat argues that the concealed weapons charge should not have gone to the jury because the State presented no evidence that a steak knife meets the definition of a "deadly weapon." He concedes that a steak knife is capable of causing death or serious physical injury, but argues that the statute also requires that the knife be specifically designed for that purpose.

We acknowledge that Liddicoat's argument based on the language of the statute defining "deadly weapon" has some force. That statute on its face seems to limit "deadly weapon" to "anything designed for ... causing death or serious physical injury." A steak knife is clearly not "designed" for the purpose of killing or injuring people, as that term is commonly understood.

But when read as a whole, the statutory definition of "deadly weapon" is ambiguous. The examples of deadly weapons actually listed in the statute—a knife, an axe, a club, metal knuckles, or an explosive—are, with the exception of a club and metal knuckles,[21] not what one would expect to find on a list of weapons designed to injure or kill people. Knives have many uses and, as a general rule, axes and explosives are designed for purposes such as felling trees and clearing rock. Indeed, "explosive" is defined in Title 11 to include items such as dynamite and blasting powder and to exclude "salable fireworks." [22] If the legislature had understood the term "explosives" to be limited to explosives designed for killing or seriously injuring people, it would have had no reason to exclude fireworks from the definition. Therefore, the legislature must have included these items in the definition of "deadly weap-

---

**18.** *Cf. Allen v. State*, 153 P.3d 1019, 1025 (Alaska App.2007) (holding that hearsay statements that would be inadmissible at trial cannot be employed to support or defend a motion for summary judgment).

**19.** A "defensive weapon" is defined as "an electric stun gun, or a device to dispense mace or a similar chemical agent, that is not designed to cause death or serious physical injury." AS 11.81.900(b)(20).

**20.** AS 11.81.900(b)(17).

**21.** "Metal knuckles" is defined in AS 11.81.900(b)(36) as "a device that consists of finger rings or guards made of a hard substance and designed, made, or adapted for inflicting serious physical injury or death by striking a person."

**22.** AS 11.81.900(b)(23).

on" not because they were specifically designed to be used as weapons but because, when used as designed—*i.e.*, to cut or to explode—they are capable of killing or injuring people.

 To resolve this ambiguity in the meaning of deadly weapon, we look to the legislative history of the statutes at issue. Alaska courts apply a sliding scale approach to statutory interpretation, which considers the legislative history of a statute and whether that history reveals a legislative intent and meaning contrary to the plain meaning of the statute.[23]

Before 1980, when the Revised Criminal Code went into effect,[24] the concealed weapons statute made it unlawful for a person

> to carry concealed about his person, in any manner, a revolver, pistol, or other firearm, or knife, other than an ordinary pocketknife, or a dirk or dagger, slingshot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of another.[25]

In the Revised Criminal Code, this statute was split into two statutes: the statute defining a "deadly weapon,"[26] which applies to numerous provisions in the Alaska Statutes,[27] and the third-degree weapons misconduct statute (the precursor to the fifth-degree weapons misconduct statute), which prohibited possession of any concealed "deadly weapon" other than an ordinary pocket knife.[28] Because these statutes were enacted at the same time, have the same source, and concern overlapping subject matter, we construe

the terms used in those statutes *in pari materia.*[29]

As just explained, the pre–1980 concealed weapon statute made it unlawful for a person to carry concealed about his person "an instrument by the use of which injury could be inflicted upon the person or property of another." The commentary to the Tentative Draft to the Revised Criminal Code indicates that this language was not included in the definition of "deadly weapon" because it was overbroad, "since virtually any item, even this volume [of the Tentative Draft], would be included in this category."[30] The drafters instead adopted the narrower language at issue in this case: "anything designed for and capable of causing death or serious physical injury."[31] The commentary suggests that this language was intended to exclude from the definition of deadly weapon items (such as legal treatises) that could conceivably cause injury or death (for instance, if dropped from a tall building), but that are not inherently dangerous.

The history of the concealed weapons statute also provides insight into what the drafters intended when they included "knife" in the definition of a deadly weapon. The pre–1980 statute made it unlawful to carry concealed about the person any knife "other than an ordinary pocketknife." This language was carried over into the current concealed weapons statute.[32] The clear implication from this language is that the drafters did not intend the definition of "knife" to be limited to knives specifically designed to be used as weapons—because if that had been the drafters' intent, there would have been

---

**23.** *Stephan v. State,* 810 P.2d 564, 566 (Alaska App.1991).

**24.** Ch. 166, SLA 1978, § 25.

**25.** AS 11.55.010 (1970).

**26.** Ch. 166, SLA 1978, § 10.

**27.** *See, e.g.,* AS 11.61.210; AS 14.03.160; AS 18.66.100; AS 26.20.100.

**28.** Ch. 166, SLA 1978, § 7.

**29.** *See* Norman J. Singer and J.D. Shambie Singer, 2B *Sutherland Statutory Construction* § 51:3, at 235–37, 275–77 (7th ed. 2008) ("[T]he rule that statutes in pari materia should be construed

together has the greatest probative force in the case of statutes relating to the same subject matter and passed at the same session of the legislature, especially if they were passed or approved or take effect on the same day, or in the case where the later of two or more statutes relating to the same subject matter refers to the earlier.").

**30.** Alaska Criminal Code Revision Part V, at 113 (Tent. Draft 1977) (commentary to Tent. Draft AS 11.71.120, misconduct involving weapons in the third degree).

**31.** *Id.*

**32.** AS 11.61.220(a)(1)(A)(i). This offense was originally enacted as third-degree weapons misconduct. *See* ch. 166, SLA 1978, § 7.

no need to exclude pocket knives from the definition. Liddicoat has not pointed to any statutory history, and we have found none, suggesting that the drafters intended to narrow this meaning of "knife" when they defined "deadly weapon" in the Revised Criminal Code.

The later history of the concealed weapons statute is consistent with this view. In 2003, when the legislature repealed the requirement of a concealed weapons permit for handguns, it amended the fifth-degree weapons misconduct statute to require any person contacted by a police officer while carrying a concealed deadly weapon to inform the officer of that possession.[33] (Before this amendment to the weapons statute, it was unlawful to carry a concealed weapon unless one had a permit, and people who had a permit were required to disclose their concealed weapon possession when they were contacted by the police.[34]) The sponsor of the legislation explained to the House Judiciary Committee that under the amended law "a knife that couldn't be characterized as an ordinary pocket knife would be a deadly weapon and couldn't be carried concealed anywhere."[35]

Other statutes that rely on the definition of "deadly weapon" in AS 11.81.900 are also consistent with this view.[36] For instance, AS 33.16.150(b)(1) permits the parole board, as a condition of parole, to prohibit a prisoner released on parole from possessing a deadly weapon (as defined in AS 11.81.900) "other than an ordinary pocket knife with a blade three inches or less in length." And AS 11.61.200, the current third-degree weapons misconduct statute, prohibits any in-person communication in violation of a domestic violence protective order while in possession of "a deadly weapon, other than an ordinary pocketknife."[37] Again, the fact that the legislature found it necessary to exclude an ordinary pocket knife from the reach of these statutes suggests that it did not view the definition of "knife" to be limited to knives specifically designed as weapons.

(We also note that we have, in previous cases, declared that a kitchen or steak knife falls within the definition of "deadly weapon" in AS 11.81.900[38]—though we put little weight on our earlier declarations on this issue, because the issue was not actively litigated in those cases.)

Liddicoat has not advanced any contrary statutory history to show that the legislature intended to exclude a steak knife from the definition of a deadly weapon. The only authority Liddicoat relied on, in superior court and in this court, is *Medley v. Runnels*,[39] a Ninth Circuit case. *Medley* interprets a California statute defining a "firearm,"[40] and does not aid us in interpreting Alaska's definition of a "deadly weapon."

We therefore conclude that Judge Carey did not err in denying Liddicoat's motion for judgment of acquittal on the fifth-degree weapons misconduct charge.

*Conclusion*

We AFFIRM Liddicoat's convictions.

---

**33.** Ch. 62, SLA 2003, §§ 1, 7.

**34.** *See* undated side-by-side comparison of concealed carry law before and after passage of H.B. 102, contained in 2003 House Judiciary Committee microfiche file on H.B. 102; *see also* Minutes of Senate Judiciary Committee, C.S.H.B. 102, statement of Mark Enoft, staff to Rep. Eric Croft, bill sponsor, Tape 03–44, Side A (May 12, 2003).

**35.** Minutes of House Judiciary Committee, H.B. 102, Statement by Rep. Croft, bill sponsor, Tape 03–40, Side B, log no. 0266 (Apr. 16, 2003).

**36.** We recognize that subsequent legislative interpretation of a statute is not conclusive on the meaning of the former statute. *See* 2B *Sutherland Statutory Construction* § 49:11 at 145–47 (7th ed.2008).

**37.** AS 11.61.200(a)(9); AS 11.56.740.

**38.** *See, e.g., Moore v. State,* 218 P.3d 303, 305 (Alaska App.2009) (stating in a case involving a robbery with a kitchen knife that "knives are classified as 'deadly weapons' for purposes of our criminal code"); *Lewandowski v. State,* 18 P.3d 1220, 1224 (Alaska App.2001), *overruled on other grounds by Michael v. State,* 115 P.3d 517 (Alaska 2005) (Mannheimer, J., concurring) (noting that steak knives and hunting knives qualify as "deadly weapons" under AS 11.81.900).

**39.** 506 F.3d 857 (9th Cir.2007).

**40.** *Id.* at 863–64 (citing Cal.Penal Code § 12001(b)).