NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>*. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| TOMMY JAMES RUMPH,<br><br>                 Appellant,<br><br>      v.<br><br>STATE OF ALASKA,<br><br>                 Appellee. | Court of Appeals No. A-13952<br>Trial Court No. 3AN-16-07493 CR<br><br>**O P I N I O N**<br><br>No. 2826 — March 13, 2026 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: Michael L. Barber, Barber Law Services, Boston, Massachusetts, under contract with the Office of Public Advocacy, Anchorage, for the Appellant. Donald Soderstrom, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Terrell, Judges.

Judge WOLLENBERG.

Tommy James Rumph was convicted by a jury of first-degree murder for shooting and killing Treavonne Owens.[1] He was also convicted of third-degree misconduct involving weapons and fourth-degree misconduct involving a controlled substance arising out of the same incident.[2] Rumph appeals his convictions, raising several challenges.

First, Rumph argues that the superior court made two erroneous evidentiary rulings — one precluding him from introducing a statement he made to his girlfriend in the aftermath of the shooting and a second precluding him from introducing evidence that Owens had a reputation for carrying a weapon. The court found that the first statement was hearsay and that "carrying a weapon" is not a character trait for purposes of admission under Alaska Evidence Rule 404(b). Having reviewed the trial record, we conclude that, to the extent there were any errors in these rulings, these errors were harmless.

Next, Rumph challenges the denial of his motion for a new trial. Following the verdict, one of the jurors sent Rumph's attorney an email expressing concerns about the jury's deliberations. The juror subsequently provided an affidavit to Rumph's attorney setting forth several allegations. Based on the contents of this affidavit, Rumph moved for a new trial, arguing that the verdict was tainted by racial bias and that the jurors had improperly considered extraneous information — in particular, knowledge gleaned from another juror's acquaintance with one of the defense witnesses and the costs associated with a potential hung jury.

Rumph argued that the general rule set out in Alaska Evidence Rule 606(b) precluding inquiry into jury deliberations had to give way to consideration of the information brought forth in the juror's post-trial affidavit. Rumph relied on the

---

[1]   AS 11.41.100(a)(1)(A).

[2]   AS 11.61.200(a)(1) and former AS 11.71.050(a)(4) (September 2016 version), respectively.

United States Supreme Court's decision in *Peña-Rodriguez v. Colorado*, which recognized a constitutionally based exception to the no-impeachment rule for "statements exhibiting overt racial bias,"[3] and the statutory exception in Evidence Rule 606(b) for extraneous information improperly brought to the jury's attention.

The superior court concluded that none of the exceptions to the general bar on impeachment relied on by Rumph applied and that further inquiry into the allegations was therefore precluded. Accordingly, the court denied Rumph's motion for a new trial without holding an evidentiary hearing.

Rumph renews this claim on appeal, arguing that the court should have granted his motion for a new trial or at least held an evidentiary hearing on his claims. But given the conclusory information about racial bias provided in the juror's affidavit and the nature of the purported extraneous information, we conclude that the superior court did not abuse its discretion in denying Rumph's motion for a new trial and evidentiary hearing. We therefore affirm the judgment of the superior court.

*Background facts*

In September 2016, Tommy James Rumph lived in Anchorage with his girlfriend, Crystal Parrilla, and her young son. Parrilla was pregnant with Rumph's child. Rumph worked as a chef at the Glacier Brewhouse with a co-worker, Treavonne "Deuce" Owens, with whom he was friendly. (Rumph had helped Owens get a job at the Brewhouse.)

On the evening of September 12, 2016, Rumph was at home with his friend, Marcus Wright; the two of them had a few drinks and used cocaine. Owens visited the two men at Rumph's home several times over the course of that night.

The last time that Owens returned, around 6:00 a.m. the following morning, Rumph and Owens got into an argument in the living room that was loud

---

3   *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017).

enough to wake up Parrilla, who was sleeping in the bedroom. Rumph and Parrilla asked Owens to leave, and Owens pushed Parrilla backward onto the couch.

Owens left the house, and Rumph followed him outside to the driveway, where their argument woke up a neighbor. Bystanders saw the two arguing closely to one another. Rumph, who was armed, then shot Owens three times. Rumph walked into the house, gave Parrilla the gun, and left.

At 6:26 a.m., Rumph texted a supervisor at the Glacier Brewhouse two messages in quick succession: "I just killed duce [sic]" followed shortly by, "Sorry Bruh[.]" Rumph left a voicemail for another supervisor at the Glacier Brewhouse, in which he stated in part:

> I done threw my life away. Deuce gone, man. I killed that [n-word] last night, man. . . . I really killed the [n-word] last night, bruh. But that [n-word] (indiscernible) threatened my family and everything, I killed him last night, bruh. . . . I'm trying to let this shit go and all this shit over some cocaine that I'm (indiscernible) ain't even a part of, bruh.

About fifteen minutes after the shooting, Parrilla called Rumph and spoke to him. When Anchorage police officers arrived at the house, they initially gave Parrilla questions to ask Rumph without his knowledge that they were present; the police then spoke to Rumph directly from Parrilla's phone.

Around 7:00 a.m., officers learned of a Facebook video Rumph had posted from a bike path. About an hour later, they located Rumph and took him into custody. During an interview, Rumph told detectives that he had consumed alcohol and four to five grams of cocaine before the shooting, and he handed the officers a bag of cocaine. Rumph reported that Owens had come over to his house that night looking for cocaine and that their argument was over money and disrespect. He posited to the police, "How am I disrespecting you by asking for my money? You know what I mean? You already in debt, how are you being disrespected, bruh?"

Rumph also told the officers that Owens had threatened his family. He said that after he and Owens argued in the house, Owens left, and Rumph followed, approaching Owens in his car. According to Rumph, Owens exited the car and pushed him in the chest, at which point Rumph shot him; Rumph told the officers, "I just blanked out, man," and "I just start shooting."

A grand jury indicted Rumph on one count of first-degree murder, two counts of second-degree murder, and one count of third-degree misconduct involving weapons (for being a felon in possession of a concealable firearm).[4] One count of fourth-degree misconduct involving a controlled substance (for possessing cocaine) was added by information.[5]

*Trial proceedings*

Rumph's case proceeded to a jury trial. During *voir dire* of the jury venire, the prosecutor alerted the prospective jurors that they might hear "cuss words, slang words, slur words, [and] racial epithets" at trial. Rumph's attorney followed up on this, asking prospective jurors about their views on the n-word and racial stereotypes.

Defense counsel then introduced the terms "thug" and "thug life," stating, "We're going to talk about guns and we're going to talk about drugs — a thug. Have you ever heard of thug life?" Jurors offered various views on the term "thug life" — some had negative connotations and others, as defense counsel characterized it, viewed it as "sort of a positive . . . lifestyle choice."[6] Defense counsel told the jurors that her

_____

[4]  AS 11.41.100(a)(1)(A), AS 11.41.110(a)(1), AS 11.41.110(a)(2), and AS 11.61.200(a)(1), respectively.

[5]  Former AS 11.71.050(a)(4) (September 2016 version).

[6]  At one point, when defense counsel was asking follow-up questions about a juror's view of a "thug," the trial court interrupted, stating, "I think we're getting a little sideways here. Thug life, being a thug, is not — you're not guilty of — that's not a crime." The court

concern was that they would hear evidence about "Black men, illegal drugs, [and] guns," and would not afford Rumph the presumption of innocence; in particular, she expressed concern that jurors would think "clearly he's a criminal" because he fits a certain stereotype "and people who have these factors are living a thug life."

At trial, the court precluded the State from introducing evidence of prior drug dealing between Rumph and Owens and prohibited the State from arguing that the dispute between Rumph and Owens related to a drug deal. The court did, however, allow the State to introduce evidence that Owens initially went to Rumph's house that night seeking cocaine, and allowed the State to characterize the dispute as being ultimately about money. In ruling on this issue, the court acknowledged, "I don't think it's a big step for [the jurors] to go to, 'I bet it was about drugs.' But I don't think we need to reinforce that."

The State called several witnesses, including Parrilla. When Rumph's attorney began asking Parrilla whether Rumph had told her, during their phone call after the shooting, that Owens had threatened his family, the court excluded the question as inadmissible hearsay.

Lucky Guerrero, Owens's cousin, testified that he was with Owens at the time of the shooting. He testified that, after Rumph and Owens argued inside just prior to the shooting, and Owens left the house, he and Owens began driving away. Owens exited the car when he saw Rumph walking toward them. According to Guerrero, neither Rumph nor Owens was displaying aggression. Guerrero then heard gunshots.

Rumph argued that he shot Owens in self-defense, and he presented several witnesses in his defense.

Rumph called Wright, his friend, to testify about the events leading up to Owens's death. Wright testified that the second time Owens came over to Rumph's

_____

then redirected questioning to whether or not the jurors could be fair, given that "there were guns involved, two African-American men, [and] drugs involved."

house that night, Owens and Rumph began arguing about money. This argument continued when Owens came back for the third and final time; Wright testified that, at that point, Rumph and Owens were verbally fighting in the house before they went outside. Wright testified that when he opened the door to go out, he saw Owens exit his vehicle and then Owens and Rumph "in the street real close"; he saw Owens "step[] forward towards Mr. Rumph" and then he heard gunshots. Wright immediately fled the scene.

Rumph also called Christopher Allridge, an officer from the Department of Corrections, to offer reputation and opinion testimony that Owens was a violent person. (The fact that Allridge was a correctional officer and that Owens had previously been in custody was not disclosed to the jury.) Rumph also sought to have Allridge testify to Owens's "reputation" for carrying weapons. The State objected that carrying a weapon is not a character trait, and the court limited Allridge's reputation testimony to only Owens's reputation for violence.

Rumph did not testify.

After a month-long trial, the jury returned a verdict finding Rumph guilty of first-degree murder, both counts of second-degree murder, and fourth-degree misconduct involving a controlled substance. (The second-degree murder verdicts merged into the first-degree murder conviction.) Rumph waived his right to a jury trial on the charge of felon in possession of a firearm, and the judge found him guilty of this offense.

*Rumph's motion for a new trial*

Less than an hour after the jury returned its verdict, Rumph's attorney received an email from one of the jurors, P.F., who stated: "It is my belief that [the jury's] actions were egregious and damning to Mr. Rumph's chance at a fair trial; however, I am not certain whether their actions are truly as bad as I believe them to be."

P.F. subsequently provided a sworn affidavit to Rumph's attorney in which he stated his belief that "the behavior of some of the other members of the jury [was] egregious and denied Mr. Rumph a fair trial." In the affidavit, P.F. described three different issues.

First, in a single paragraph, P.F. alleged that during jury deliberations, the jury had been prejudiced by racial bias against Rumph. With respect to this issue, the affidavit stated:

> Based on the statements made and attitudes of certain jurors during deliberations, the jury's verdict was the result of racism and prejudice. It was clear to me that other jurors considered Mr. Rumph a "thug" or a "gangbanger" and their verdict was influenced by that prejudice. The jury speculated that Mr. Rumph was a drug dealer and Mr. Owens was selling drugs for him. I was present during the entire jury selection process. The attitude and beliefs that were exhibited by certain jurors during deliberations were not disclosed during the jury selection process.

Second, P.F. alleged that the jury had considered extraneous information. According to P.F., one juror was acquainted with defense witness Allridge and invited the jury to speculate as to why Allridge did not display his usual "jovial" demeanor during his testimony and about how he knew Owens. (The referenced juror, E.S., had previously disclosed to the court and the parties that he knew Allridge professionally.[7]) In particular, with respect to this issue, the affidavit stated:

> During deliberations, one of the jurors told the panel that he knew one of the witnesses, Christopher Allridge. He

---

[7]   E.S. was employed as a judicial services officer — a fact known to the court and the parties. When Allridge was called as a witness for the defense, E.S. requested a private conference with the court; he informed the court that he knew Allridge (a correctional officer) on a professional level. Since Allridge was a defense witness, his name had not been disclosed to the jurors during jury selection as a potential witness. Upon questioning by the court, E.S. confirmed that his acquaintance with Allridge would not impair his ability to deliberate as a juror, and neither party asked the court to take any further action at that time.

reported to the jury that Mr. Allridge was normally a "very jovial" person and his behavior on the stand was abnormal. He told the jury that: 1) Mr. Allridge worked for the Department of Corrections; 2) Mr. Allridge's opinion of Mr. Owens was most likely based on an "incident report" while Mr. Owens was in jail; 3) Mr. Allridge acted the way he did on the stand because the defense subpoenaed him to be there. That juror may have been considered by other jurors as an "expert" and he was providing outside information to help them judge Mr. Allridge's credibility beyond what was in the jury instruction. I believe that affected the jury's verdict.

Finally, P.F. alleged that he had been pressured into making a hasty decision. He stated that initially, jurors respected his different opinion about the case, but as time went on, other jurors pressured him into ending the deliberations and "forfeiting [his] position on self-defense." As relevant to this appeal, he alleged that one juror encouraged the jury to consider the financial burden of the trial to the State and the consequences of a hung jury. With respect to this statement, the affidavit asserted: "One juror said that the jury should consider the financial burden the state has incurred, the likelihood of the case not being retried, and the consequences of a guilty person getting set free."

Based on P.F.'s affidavit, Rumph's attorney moved for a new trial and requested an evidentiary hearing. The attorney attached P.F.'s affidavit to the motion.

In the motion, defense counsel asserted that there was no evidence presented at trial that Rumph was in a gang or that he dealt drugs, or "that may have supported any inference that Mr. Rumph had a 'criminal' lifestyle." Thus, according to the motion, in calling Rumph a "thug" and "gangbanger," and in speculating that he dealt drugs, the jury must have drawn assumptions about Rumph based on his race. Defense counsel argued that, under the United States Supreme Court's decision in *Peña-Rodriguez v. Colorado*, the no-impeachment rule had to give way to consideration

of evidence of the jury's racial bias.[8] Defense counsel further argued that the jury had considered "extraneous prejudicial information" (an exception to the no-impeachment rule in Evidence Rule 606(b)) in the form of a juror's acquaintance with the witness Allridge and another juror's consideration of the cost of the trial and the consequences of a hung jury.

The State opposed Rumph's motion. The State maintained that "thug" and "gangbanger" are not racially based terms and that Rumph had failed to present any permissible evidence of improper racial bias for purposes of *Peña-Rodriguez*. The State noted that Rumph's own attorney had used the word "thug" during *voir dire* and associated it with the case, and the State contended that there was evidence at trial from which the jury could infer that Rumph was a "thug" or had a "criminal lifestyle." The State therefore argued that the *Peña-Rodriguez* exception to the no-impeachment rule did not apply. The State further argued that the jurors' statements about the defense witness Allridge and the costs of the trial were barred by Evidence Rule 606(b) because they did not fall within the exception for "extraneous prejudicial information."

In Rumph's reply to the State's opposition to his motion, defense counsel reiterated her argument that the allegations of racial bias were admissible under *Peña-Rodriguez*. For the first time, counsel cited a Washington Supreme Court case, *State v. Berhe*, in which the Washington court announced a procedure for trial courts to follow when confronted with an accusation of a juror's implicit or explicit racial bias.[9] Under *Berhe*, a court must conduct a preliminary inquiry into allegations of implicit racial bias before deciding whether to grant an evidentiary hearing.[10] Defense counsel acknowledged that Alaska had not developed a similar procedure, and she did not ask

---

[8] *Peña-Rodriguez*, 580 U.S. at 215.

[9] *State v. Berhe*, 444 P.3d 1172 (Wash. 2019).

[10] *Id.* at 1182.

the superior court to adopt such a procedure. Instead, she simply urged the court to consider "the Washington Supreme Court's firm stance on the importance of reviewing evidence related to allegations of racial bias during jury deliberations."

The superior court denied Rumph's motion for a new trial without holding an evidentiary hearing. The court held that P.F.'s affidavit did not meet the standard set out in *Peña-Rodriguez* for overcoming the no-impeachment rule and that there was thus no basis for hearing further evidence of this claim. The court found that "thug" and "gangbanger" are race-neutral terms,[11] and that, contrary to Rumph's characterization of the record, there *was* evidence presented at trial from which a juror could conclude that Rumph was a "thug" who lived a "criminal lifestyle" — namely, that he had used cocaine on the night of the incident (and was separately convicted for cocaine possession) and that he had given Owens cocaine earlier that night. The court concluded that Rumph had failed to set out facts meeting the *Peña-Rodriguez* standard that a statement of racial animus was a significant motivating factor in the jurors' votes to convict. The court's order did not make any mention of *Berhe*.

With respect to Rumph's remaining arguments, the court concluded that the jurors' statements about Allridge and the cost of the trial did not constitute "extraneous prejudicial information" within the meaning of Evidence Rule 606(b).

This appeal followed.

*Why we conclude that any error in the superior court's ruling excluding Rumph's statement as hearsay is harmless*

Immediately after shooting Owens, Rumph entered his house, handed Parrilla his gun, and exited. About fifteen minutes after Rumph left the house, Parrilla

---

[11] In reaching the conclusion that these terms are race neutral, the court relied on dictionary definitions of the terms.

called Rumph and spoke to him. She testified that, during this call, "he was pretty torn up," "very upset," "not calm," and "sounded like he could've been crying."

During cross-examination, Rumph's attorney began asking Parrilla whether Rumph told her over the phone that Owens had threatened his family. The court sustained the State's hearsay objection. Rumph argued that the statement was admissible under the hearsay exception for excited utterances, but the court ruled that the statement was not an excited utterance.

Rumph subsequently moved for reconsideration. The court denied the motion, again noting that at least fifteen minutes had elapsed between the time of the shooting and the statement and finding that, given that timeframe, Rumph had enough time to fabricate a reason for shooting Owens. The court therefore found that the statement was not an excited utterance. Specifically, the court ruled as follows:

> The statement Mr. Rumph seeks to admit was given at least fifteen minutes after the shooting. . . . He had left the scene. Given the amount of time that had elapsed, it was certainly enough time for him to form a reason as to why he shot Mr. Owens. It was not an excited utterance, and the motion to reconsider is denied.

Hearsay statements — out-of-court statements offered to prove the truth of the matter asserted — are inadmissible unless an exception applies.[12] One of these exceptions is for an excited utterance, or "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."[13] The Commentary to the Alaska Rules of Evidence explains that the rationale for this exception is "that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances

---

[12]   Alaska R. Evid. 801(c), 802.

[13]   Alaska R. Evid. 803(2).

free of conscious fabrication. . . . Spontaneity is the key factor."[14] While there is no hard-and-fast rule for how long this excitement can prevail after the startling event, the Commentary suggests that "the character of the transaction or event will largely determine the significance of the time factor."[15]

In Alaska, the test for determining whether a statement qualifies as an excited utterance is whether "the declaration [was] spontaneous, excited, or impulsive, or [whether it was] the product of reflection and deliberation."[16] While the duration since the exciting event is a relevant factor in answering this question, it is not necessarily a decisive factor.[17]

Here, the court appeared to place dispositive weight on the fact that fifteen minutes had passed between the exciting event and the statement. But other factors, like Parrilla's testimony about Rumph's demeanor and level of excitement, the fact that he was evading officers and had a motive to lie, and the character of the startling event (here, having shot and killed a coworker) were additional proper considerations. To the extent the court singularly relied on the amount of time that had elapsed to the exclusion of these other considerations, the court's analysis was incomplete; the fact that fifteen minutes had elapsed did not alone answer the question of whether Rumph was still "under the stress of excitement caused by the event or condition."[18]

---

[14]  Alaska R. Evid. 803(1)-(2) cmt.

[15]  *Id.*

[16]  *State v. Agoney*, 608 P.2d 762, 764 (Alaska 1980).

[17]  *Dezarn v. State*, 832 P.2d 589, 591 (Alaska App. 1992) (recognizing that "[t]he declarant's spontaneity, a product of the emotions being experienced by the declarant, is the key factor in determining the admissibility of the statement," and "the amount of elapsed time is not the sole factor to be considered").

[18]  *See, e.g.*, *Charles v. State*, 780 P.2d 377, 382 (Alaska App. 1989) (upholding trial court's admission of statement made thirty-seven minutes after a shooting as an excited utterance).

But even if the court should not have excluded Rumph's statement, any error is harmless in light of the trial record as a whole. Rumph sought to admit Parrilla's testimony that he had told her over the phone that Owens had threatened his family during their argument prior to the shooting, presumably to bolster his argument at trial that he acted in self-defense and reasonably feared for his life. But the testimony of other witnesses and the audio exhibits entered at trial provided ample other evidence that Owens had threatened Rumph.

The State introduced Rumph's voicemail to his supervisor at the Glacier Brewhouse, which included his statement that Owens had "threatened [his] family and everything." The officer who arrested Rumph also testified at trial that he recalled Rumph saying that "his family had been threatened by Treavonne Owens." In addition, the audio recording of Rumph's interview with officers after his arrest included Rumph's statements: "[Owens] pushed me, I felt threatened," and "I just blanked out, man. I felt threat. Straight up." Wright, who was present with Rumph and Owens the whole night, testified that Owens had threatened Rumph.

Based on this evidence, Rumph's attorney argued that Rumph shot Owens in self-defense. The attorney claimed that Rumph was threatened by Owens and that Rumph reasonably feared for his life. She pointed to these other sources of evidence in her summation to the jury, including Rumph's voicemail to his supervisor and the testimony of his arresting and interviewing officers.

Given these other sources of evidence that Owens had threatened Rumph, we conclude that any error by the superior court in excluding Rumph's statement to Parrilla that he had been threatened by Owens did not appreciably affect the verdict or prejudice Rumph.

*Why we conclude that the superior court's ruling precluding Allridge from testifying about Owens's reputation for carrying weapons is harmless*

Rumph called Allridge, who worked as a correctional officer for the Department of Corrections, to testify to his opinion that Owens was a violent person and that Owens had a reputation for having a violent character and for carrying weapons. Allridge had worked as a correctional officer in the Anchorage Correctional Complex, where Owens was an inmate. The defense sought to have Allridge testify that, based on a prior incident (the details of which were not disclosed to the jury), his opinion was that Owens was a violent person. The defense also sought to have Allridge testify that, based on being a member of the same community as Owens, Owens had a reputation in that community for violence and for carrying weapons.[19]

The State objected that "carrying a weapon" is not a character trait, and the court agreed. The court ruled that Allridge could testify as to his opinion that Owens was violent and to Owens's reputation for violence, but not to his reputation for carrying a weapon, because carrying a weapon is not a character trait; according to the court, it was "more akin to habit evidence."

Rumph challenges this ruling.

Under Alaska Evidence Rule 404(a), evidence of a person's character trait is generally inadmissible to show that the person acted in conformity with that character trait on a particular occasion.[20] Rule 404(a)(2), however, sets out an exception to this rule for evidence offered by the accused of a victim's relevant character trait.[21] A victim's character for violence, for instance, may be relevant when the accused claims

---

[19] The fact that this community was a correctional facility was not disclosed to the jury.

[20] Alaska R. Evid. 404(a).

[21] Alaska R. Evid. 404(a)(2).

self-defense at trial; this means that Owens's character for violence was relevant and admissible in Rumph's trial.[22]

On appeal, Rumph claims that Owens's character for "carrying a weapon" was similarly relevant and admissible because "carrying a weapon" is a character trait. The State responds that Rumph failed to show that carrying a weapon is a character trait and that Allridge was in no position to testify to Owens's reputation for carrying a weapon because he knew Owens as an inmate at the jail, where Owens was prohibited from having weapons.

While the Evidence Rules do not define "character" or "character trait," the Commentary to Alaska Evidence Rule 406 — which permits evidence of habit and routine practice — discusses the blurry line between character traits and habit: "Character is a generalized description of one's disposition, or of one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness. 'Habit,' in modern usage, both lay and psychological, is more specific. It describes one's regular response to a repeated specific situation."[23]

We doubt whether carrying a weapon is a character trait under Evidence Rule 404(a)(2). But in any event, other evidence at trial established that Owens had a reputation for carrying a weapon, so any error in limiting Allridge's testimony is harmless.

Parrilla testified that she had seen Owens carrying a firearm at her house on previous occasions, and Wright testified that Owens had a reputation for carrying a gun. In addition, the jury saw evidence that Owens had a tattoo on his back of two

---

[22] *See Gottschalk v. State*, 881 P.2d 1139, 1142-43 (Alaska App. 1994). The form of this evidence is addressed by Alaska Evidence Rule 405 and discussed in *Jones-Nelson v. State*, 446 P.3d 797, 801-02 (Alaska App. 2019), *overruled on other grounds*, 512 P.3d 665 (Alaska 2022).

[23] Alaska R. Evid. 406 cmt.; *see also Lopez v. State*, 2018 WL 3770024, at *4 (Alaska App. Aug. 8, 2018) (unpublished) (discussing the character/habit distinction).

handguns and a gear-shifter in his car customized to look like the handle of a gun. Because the jury received other evidence that Owens had a reputation for carrying a weapon, or was associated with weapons, the superior court's ruling limiting Allridge's testimony to this effect is harmless.

> *Why we affirm the superior court's denial of Rumph's motion for a new trial and evidentiary hearing*

Under Alaska Evidence Rule 606(b), a litigant may not generally impeach a jury's verdict through the use of juror affidavits, evidence, or testimony. In particular, the rule precludes a litigant from presenting evidence by a juror of a statement or matter occurring during the jury's deliberations or the effect of any matter upon a juror's decision-making:

> [A] juror may not be questioned as to any matter or statement occurring during the course of the jury's deliberations or to the effect of any matter or statement upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith[.][24]

This relatively strict "no-impeachment" rule is modeled on the corresponding federal evidence rule, Federal Evidence Rule 606(b), and is designed "to protect jurors from harassment, to encourage free jury deliberation, and to promote the finality of verdicts."[25] The rule applies equally to a juror's affidavit or to other evidence

---

[24]  Alaska R. Evid. 606(b).

[25]  *Titus v. State*, 963 P.2d 258, 261 (Alaska 1998) (discussing the Commentary to Evidence Rule 606(b)); *see also Peña-Rodriguez v. Colorado*, 580 U.S. 206, 211 (2017) ("A general rule has evolved to give substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations. This principle, itself centuries old, is often referred to as the no-impeachment rule."); *Tanner v. United States*, 483 U.S. 107, 127 (1987) (noting that "long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry").

of a statement about which a juror would be precluded from testifying.[26]

Alaska Evidence Rule 606(b) itself contains two exceptions to the bar on consideration of a juror's post-verdict statements to impeach a verdict. First, a juror may testify as to "whether extraneous prejudicial information was improperly brought to the jury's attention." Second, a juror may testify as to "whether any outside influence was improperly brought to bear upon any juror."[27] As the Commentary to Evidence Rule 606(b) explains, "The effect of this approach is to restrict inquiry into the deliberations of the jury and to permit inquiry into extraneous matters."[28]

In 2017, in *Peña-Rodriguez v. Colorado*, the United States Supreme Court recognized an additional, constitutionally based exception to the no-impeachment rule.[29] The Supreme Court held that the Sixth Amendment right to an impartial jury

---

[26] Alaska R. Evid. 606(b). This rule does not apply before the jury begins its deliberations and it does not preclude non-juror evidence after the verdict. As we explained in *Larson v. State*, "The rule prohibits the use of juror testimony and juror affidavits in 'an inquiry into the validity of a verdict,' but it does not restrict the use of this evidence when the court investigates potential juror misconduct before the jury renders its decision." *Larson v. State*, 79 P.3d 650, 653 (Alaska App. 2003); *see also Tanner*, 483 U.S. at 127 (explaining that other procedures in the trial process are intended to limit juror misconduct, such as *voir dire*, reporting of misconduct during the trial and before the verdict, and the use of non-juror evidence after trial).

[27] Alaska R. Evid. 606(b); *Larson*, 79 P.3d at 654. A court can consider juror testimony "to prove or disprove the *occurrence* of" extraneous prejudicial information or outside influences, but it cannot consider post-verdict juror testimony "when offered to prove the *effect* of these events" on the jurors' deliberative processes. *Burney v. State*, 563 P.3d 86, 109-10 (Alaska App. 2025) (quoting *Larson*, 79 P.3d at 654).

[28] Alaska R. Evid. 606(b) cmt.

[29] *Peña-Rodriguez*, 580 U.S. at 225.

requires that the no-impeachment rule yield to evidence of a "clear statement" that a juror was motivated by racial bias in returning a guilty verdict.[30]

In *Peña-Rodriguez*, a jury found the defendant, a Mexican man, guilty of harassment and unlawful sexual contact of two teenage girls.[31] Following the verdict, two jurors reported to defense counsel that another juror had expressed anti-Hispanic bias toward the defendant and the defendant's alibi witness; with the court's supervision, defense counsel obtained sworn affidavits from the two jurors.[32]

In their affidavits, the jurors described a number of biased statements made by the other juror: first, that he "believed the defendant was guilty because, in [his] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women"; second, that the defendant "did it because he's Mexican and Mexican men take whatever they want"; and finally, that "nine times out of ten, Mexican men were guilty of being aggressive toward women and young girls."[33] According to the affidavits, the juror in question also stated that he did not believe the defendant's alibi witness because the witness was "an illegal," despite the witness's testimony that he was a legal resident of the United States.[34]

The trial court acknowledged the juror's apparent bias but denied the defendant's motion for a new trial, ruling that Colorado's version of the no-

---

[30]  *Id.* The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]"

[31]  *Peña-Rodriguez*, 580 U.S. at 211-12.

[32]  *Id.* at 212.

[33]  *Id.* at 212-13.

[34]  *Id.* at 213.

impeachment rule (Colorado Rule of Evidence 606(b)) precluded inquiry into statements made during the jury deliberations.[35] The Colorado appellate courts affirmed.[36]

The United States Supreme Court reversed, recognizing for the first time an exception to the no-impeachment rule for evidence of a "clear statement" by a juror that indicated that they "relied on racial stereotypes or animus to convict a criminal defendant."[37] The Supreme Court underscored the unique historical, constitutional, and institutional concerns implicated by racial bias, and noted that seventeen other jurisdictions had already recognized a racial-bias exception to the no-impeachment rule without any apparent increase in juror harassment or loss of juror willingness to engage in candid deliberations.[38] The Court held that a constitutional exception to the no-impeachment rule for racial bias was necessary to prevent "a systemic loss of confidence in jury verdicts."[39]

Under this exception, when a juror comes forward after the discharge of the jury with compelling evidence that another juror made "clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict," the no-impeachment rule must yield to allow the trial court to "consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee."[40]

---

[35]  *Id.*

[36]  *Id.* at 214.

[37]  *Id.* at 225.

[38]  *Id.* at 224, 227-28.

[39]  *Id.* at 225.

[40]  *Id.* at 211, 225.

The Court added, however, that "[n]ot every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry."[41] Rather, the Court stated:

> For the inquiry to proceed, there must be a showing that one or more jurors *made statements exhibiting overt racial bias* that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that *racial animus was a significant motivating factor in the juror's vote to convict.*[42]

The Court held that whether that threshold showing has been satisfied is "a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence."[43] The Court declined to detail the procedures a court must follow when confronted with a motion for a new trial based on juror testimony of racial bias, or to set out the standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and a new trial granted.[44]

> *Rumph did not establish a prima facie case of racial bias as defined under the Peña-Rodriguez exception to the no-impeachment rule*

On appeal, Rumph argues that P.F.'s statements in his affidavit amounted to a "clear statement" under *Peña-Rodriguez* that the jury relied on racial animus in reaching its verdict and that the trial court erred in finding that racial animus was not "a significant motivating factor" in the jury's decision to convict. At a minimum, Rumph contends, the court should have conducted an evidentiary hearing "to further investigate

---

[41] *Id.* at 225.

[42] *Id.* at 225-26 (emphasis added).

[43] *Id.* at 226.

[44] *Id.*

whether and to what extent racial bias and animus impacted the jury and its deliberations."[45]

As an initial matter, we note that Rumph relies on *Peña-Rodriguez* in arguing that he is entitled to a new trial. But *Peña-Rodriguez* is a rule of evidentiary admissibility, governing the question of whether the court can inquire into post-verdict statements by jurors regarding jury deliberations; it is not a standard governing the granting of a new trial. As we noted above, the Court in *Peña-Rodriguez* specifically declined to decide "the appropriate standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and a new trial be granted."[46] Indeed, the Court declined to even detail the "practical mechanics of acquiring and presenting . . . evidence" of racial bias.[47]

Rather, *Peña-Rodriguez* establishes a substantive exception to the evidence rule that generally bars inquiry into statements made during jury deliberations. This same dichotomy — between the admissibility of evidence and the entitlement to a new trial — is reflected in the Commentary to Alaska Evidence Rule 606(b), which states: "[Rule 606] does not purport to set out the substantive grounds requiring verdicts to be set aside for irregularity. It does attempt to define the guidelines concerning the competency of jurors to testify as to those grounds."[48]

---

[45] Rumph mentions in passing that the court should have held an evidentiary hearing to determine not only whether racial bias and animus impacted the jury's deliberations, but also whether the jurors may have misrepresented their lack of preexisting bias during jury selection. *See Poulin v. Zartman*, 542 P.2d 251, 264-65 (Alaska 1975). For this latter proposition, Rumph offers no further argument and it is therefore waived.

[46] *Peña-Rodriguez*, 580 U.S. at 228.

[47] *Id.* at 226.

[48] Alaska R. Evid. 606(b) cmt. The Commentary also notes (pre-*Peña-Rodriguez*) that "[w]hether the verdict should be set aside and a new trial ordered rests in the sound discretion of the trial judge, but generally the verdict should stand unless the evidence

Thus, the critical question at this stage is not whether Rumph was entitled to a new trial, but whether Rumph set forth a *prima facie* claim of racial bias requiring the court to hold an evidentiary hearing and take juror testimony on his claims. Because Rumph does not raise a separate claim under the Alaska Constitution, our consideration of this issue is limited to the federal constitutional exception to the no-impeachment rule recognized in *Peña-Rodriguez*.

As a general matter, a litigant is entitled to an evidentiary hearing on a motion when there is a "genuine dispute concerning a material fact."[49] Under Alaska Criminal Rule 42(e)(3), "If material issues of fact are not presented in the pleadings, the court need not hold an evidentiary hearing."

The moving party bears the burden of alleging specific facts, supported by affidavits or other documents, that would entitle the party to relief.[50] These affidavits must be based on personal knowledge and set forth facts that would be admissible at the hearing.[51] This standard is similar to the standard governing whether factual assertions in a post-conviction relief application are well-pleaded: while assertions of

---

clearly establishes a serious violation of the juror's duty and deprives a party of a fair trial." *Id*.

Under Alaska Criminal Rule 33, the question of whether a new trial is required is generally governed by the "interest of justice" standard. We need not determine the ultimate standard here because we conclude that, under *Peña-Rodriguez*, the court did not abuse its discretion in declining to further consider P.F.'s allegations. *See Peña-Rodriguez*, 580 U.S. at 225-26 (noting that whether a defendant has made a "threshold showing" that racial animus cast serious doubt on the verdict sufficient to allow further judicial inquiry is "a matter committed to the substantial discretion of the trial court").

[49] *Liddicoat v. State*, 268 P.3d 355, 358 (Alaska 2011) (upholding trial court's decision to deny motion for a new trial based on juror misconduct without holding a hearing because the motion did not include affidavits based on personal knowledge).

[50] *Id.*

[51] *Id.*

objective facts are entitled to the presumption of truth at the pleading stage, conclusory assertions about ultimate issues are not.[52]

Here, the court was not required to hold an evidentiary hearing on Rumph's claim of racial bias unless he presented facts which, if proven, would fall within the *Peña-Rodriguez* exception on which he relied. But P.F.'s affidavit did not contain specific factual assertions that, if true, would meet this exception.

Rather, the assertion of racial bias set out in P.F.'s affidavit was vague and conclusory.[53] In his affidavit, P.F. stated that, "[b]ased on the statements made and attitudes of certain jurors during deliberations, the jury's verdict was the result of racism and prejudice." But there was nothing to suggest that this was anything more than P.F.'s own subjective view of events; the affidavit did not describe the content of these "statements and attitudes" — that is, the affidavit did not describe, even generally, what statements were made and by whom.

This is not the "clear statement" to which *Peña-Rodriguez* refers. Rather, *Peña-Rodriguez* requires evidence of a "clear statement" by another juror indicating racial animus — more specifically, "a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the

---

[52] *See LaBrake v. State*, 152 P.3d 474, 480-81 (Alaska App. 2007).

[53] As a reminder, Juror P.F.'s affidavit stated the following with respect to his assertion of racial animus by the jury:

> Based on the statements made and attitudes of certain jurors during deliberations, the jury's verdict was the result of racism and prejudice. It was clear to me that other jurors considered Mr. Rumph a "thug" or a "gangbanger" and their verdict was influenced by that prejudice. The jury speculated that Mr. Rumph was a drug dealer and Mr. Owens was selling drugs for him. I was present during the entire jury selection process. The attitude and beliefs that were exhibited by certain jurors during deliberations were not disclosed during the jury selection process.

jury's deliberations."[54] The affidavit here did not present objective information about what was said during deliberations; it simply presented a conclusory and subjective assertion of the ultimate fact to be proven.[55]

In his affidavit, P.F. made two statements in support of his assertion that "the jury's verdict was the result of racism and prejudice."

First, P.F. stated that it "was clear to me that other jurors considered Mr. Rumph a 'thug' or a 'gangbanger' and [that] their verdict was influenced by that prejudice." But the affidavit is ambiguous as to whether other jurors actually used these words or if these were P.F.'s own words, based on the discussion of the word "thug" and related issues by defense counsel during *voir dire*.[56] Moreover, when defense counsel introduced the term "thug" in *voir dire*, she connected the term to the use of guns and drugs — both of which were involved in this case.[57] Because P.F.'s affidavit did not include even a basic description of the statements made by other jurors, it is

---

[54] *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017).

[55] *See State v. Spates*, 953 N.W.2d 372, 2020 WL 6156739, at *6 (Iowa App. 2020) (unpublished) ("[W]hether to receive juror testimony and whether to grant a new trial . . . should be based on *objective* circumstances, *e.g.*, what was said; how and when it was said; what was said and done before and after; whether and how the statements relate to evidence in the case; whether and how the statements relate to the issues the jury will decide when reaching a verdict. . . . [N]either determination should depend on the jurors' *subjective* evaluations of their own motives—or the motives of other jurors—in voting to convict.").

[56] We recognize that *voir dire* is one of the procedural safeguards espoused by courts as an antidote to the draconian policies encoded in the no-impeachment rule; the Supreme Court in *Peña-Rodriguez* noted that "careful *voir dire*" operates as a safeguard against a biased jury. *Peña-Rodriguez*, 580 U.S. at 224-25, 228. We note defense counsel's repeated use of the terms "thug" and "thug life" in *voir dire* simply to underscore that the context for the jurors' alleged use of these terms during deliberations is unclear.

[57] Defense counsel stated, "We're going to talk about guns and we're going to talk about drugs — a thug. Have you ever heard of thug life?"

impossible to evaluate the context in which any purported statements were made and whether they related to racial bias.[58]

In his reply brief, Rumph argues that, "where his claim of racial bias turned, at least in part, on the context in which certain terms were used or considered by the jury, an evidentiary hearing would have allowed the trial court to determine

---

[58] This is not to say that "thug" is necessarily a racially neutral term, as the superior court found. As both parties acknowledge, context is key.

Though courts have not had much occasion to consider the use of the word "thug" in the context of jury deliberations, one area of the law has generated much discussion on the topic: civil rights law. The guiding principle from these cases is that a facially neutral term may indicate racial bias depending on context. *Compare Gaston v. Bd. of Educ. of Chicago*, 2019 WL 398688, at *6 (N.D. Ill. Jan. 31, 2019) (unpublished) (stating that "thug" is "of course . . . a racially-charged word"), *and Thelwell v. City of New York*, 2015 WL 4545881, at *11 (S.D.N.Y. July 28, 2015) (unpublished) (recognizing that "thug" can be a racially biased term), *with Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 782-83 (4th Cir. 2023), *and Williams v. Signature Healthcare*, 2017 WL 2272078, at *3 (N.D. Fla. May 24, 2017) (unpublished) (both concluding that "thug" was not a racially biased term given the context of plaintiffs' claims). *Cf. Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (noting, in the context of a claim under the Civil Rights Act: "Although it is true the [use of the word 'boy' to refer to an employee] will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage"); *Robinson*, 70 F.4th at 782 (stating that the word "'thugs' is often used non-racially to express disapproval of group behavior" and noting that "the last three U.S. presidents have used the term to refer to non-Black people and mixed-race groups").

We agree with the parties that context is key — that a facially neutral term may indicate racial bias depending on context. To the extent the superior court concluded that the terms "thug" and "gangbanger" were necessarily "race neutral" and "not racially based terms" based solely on dictionary definitions, we think this is an overly simplistic view. *See, e.g.*, *Harden v. Hillman*, 993 F.3d 465, 482-83 (6th Cir. 2021) (detailing pervasive historical racial stereotypes and the "War on Drugs," and evaluating statements by jurors within that larger sociological and historical context and the evidence at trial). But, as we noted above, P.F.'s affidavit did not provide any context for the use of these terms. We note that when defense counsel inquired about the terms "thug" and "thug life" in *voir dire*, the jurors gave varied responses that suggested that they did not view these terms as having a singular meaning or that the meaning was necessarily race-based.

whether the jury's use of these terms was truly race neutral or suggested racial bias or animus by certain jurors." But the court could not receive testimony by the jurors on this point absent some indication that this testimony fell within the *Peña-Rodriguez* exception to the no-impeachment rule on which he relied.

Second, P.F. noted that the jury "speculated that Mr. Rumph was a drug dealer and [that] Mr. Owens was selling drugs for him." But again, on the face of the affidavit, there is nothing connecting this speculation by jurors to racial prejudice other than P.F.'s own subjective evaluation of the other jurors' motives. As the trial court found, inferences as to drug use and drug sales were reasonable based on the evidence.[59] Indeed, even though the trial court issued a protective order during trial that prevented the State from introducing evidence of Rumph's prior drug dealings with Owens, the court nonetheless noted at the time: "I mean we have a fairly intelligent jury. I don't think it's a big step for them to go to, 'I bet it was about drugs.'" The observation by P.F. that other jurors were "speculat[ing] that Mr. Rumph was a drug dealer" is precisely the type of discussion the trial court predicted and that is shielded from inquiry under Evidence Rule 606(b).[60]

---

[59] Multiple sources confirmed that Rumph, Owens, and Wright were using cocaine that night. Wright testified that both he and Rumph used cocaine that night, and that Owens "ended up doing a line with us." Rumph himself told the detectives that he had used cocaine that night, that Owens had come to his house looking for cocaine, and that their disagreement was about money and disrespect. When the detectives let Rumph out for a smoke break, he handed them a bag of cocaine (for which he was ultimately convicted of cocaine possession). In addition, in a voicemail to his supervisor after he shot Owens, Rumph stated, "[A]ll this shit over some cocaine."

[60] *Compare Ruiz v. Lumpkin*, 653 F. Supp. 3d 331, 342-43 (N.D. Tex. 2023) (holding that affidavits suggesting that jurors believed the defendant was a violent and dangerous criminal did not satisfy the *Peña-Rodriguez* standard where there was abundant evidence at trial that defendant had spent his life "in a world of drugs, guns, and violence"), *with Harden*, 993 F.3d at 473, 483-85 & n.7 (concluding that jurors' statements that defendant was a "crack head," that his wife looked like she was on heroin, and calling his all-Black legal team the "Cosby Show" met the *Peña-Rodriguez* standard, particularly where the record showed that the jurors discounted the defendant's testimony because of these

In short, Rumph did not allege objective facts about what had been said during deliberations; rather, he offered P.F.'s subjective impression of other jurors' thought processes. Accordingly, Rumph's claim failed to present factual assertions to support the first part of the *Peña-Rodriguez* test — the requirement that a juror made "statements exhibiting overt racial bias."[61]

For this same reason, P.F.'s allegations fell short of showing that racial bias motivated Rumph's guilty verdict.[62] In a motion for a new trial, conclusory assertions as to ultimate issues are not afforded the presumption of truth.[63] P.F.'s

---

stereotypes and the only evidence of defendant's drug use was a failed marijuana test over thirty years old), *and United States v. Smith*, 2018 WL 1924454, at *4, 10, 13 (D. Minn. 2018) (concluding that juror's statement "you know [the defendant]'s just a banger from the hood, so he's got to be guilty" met the *Peña-Rodriguez* standard where there was no evidence presented at trial that the defendant was a gang member, but there was evidence that the "hood" referred to an inner-city neighborhood that was primarily African-American; thus, the juror relied on a racial stereotype to find that the defendant "was a gang member, should be disbelieved, and was guilty").

[61]  *See Commonwealth v. Rosenthal*, 233 A.3d 880, 884, 886 (Pa. Super. 2020) (holding that, although ethnic jokes and stories told by jurors during deliberations led a juror to question whether the jury rendered a fair and impartial verdict, the juror's conclusion arose out of the juror's speculation as to her fellow jurors' thought processes rather than on the content of the comments themselves, which were not directed at any trial participant, and thus the court did not abuse its discretion in declining to further inquire into the jury's deliberations); *see also State v. Brown*, 62 A.3d 1099, 1110-11 (R.I. 2013) (upholding, prior to *Peña-Rodriguez*, trial court's ruling that allegations of racial bias by jurors did not warrant evidentiary hearing because the statements in the affidavits were impressions or opinions based on ambiguous conduct).

[62]  *See Peña-Rodriguez v. Colorado*, 580 U.S. 206, 225-26 (2017).

[63]  *Cf. LaBrake v. State*, 152 P.3d 474, 481 (Alaska App. 2007) (recognizing that, when deciding a motion to dismiss for failure to state a *prima facie* claim for post-conviction relief, a court need not assume the truth of "conclusory assertions concerning the ultimate facts to be decided").

conclusory assertion that "[the jury's] verdict was influenced by that [racial] prejudice" does not meet this test.

We note that in *Peña-Rodriguez*, the United States Supreme Court fashioned a relatively narrow exception to the no-impeachment rule.[64] Our review of cases applying this standard since the Supreme Court's decision in 2017 has revealed very few instances where a juror's allegation of racial bias warranted an exception to the no-impeachment rule.[65] We have identified many more cases in which allegations of explicit and troubling juror statements have failed to clear the high *Peña-Rodriguez* bar.[66]

But Rumph does not raise a claim under the Alaska Constitution or argue that the Alaska Constitution calls for a different or more expansive standard. And *Peña-Rodriguez* represents the Supreme Court's balancing of the opposing interests of the

---

[64] *See United States v. Birchette*, 908 F.3d 50, 57 (4th Cir. 2018) (recognizing *Peña-Rodriguez* as a narrow, though important, holding in which the Supreme Court "balanced the iniquity of racial animus in the jury system against the important purposes served by the no-impeachment rule"); *United States v. Nucera*, 67 F.4th 146, 151 (3d Cir. 2023) (recognizing *Peña-Rodriguez* as a "narrow constitutional exception").

[65] *See, e.g.*, *Smith*, 2018 WL 1924454, at *13; *Harden*, 993 F.3d at 485.

[66] *See, e.g.*, *Nucera*, 67 F.4th at 169 (holding that "expressions of racial animus among jurors" (but not directed at defendant) do not meet *Peña-Rodriguez* and thus upholding denial of evidentiary hearing); *United States v. Robinson*, 872 F.3d 760, 764, 771 (6th Cir. 2017) (holding that jury foreperson's statements to the only two Black jurors accusing them of being hesitant to convict the defendant because they felt they "owed something" to their "[B]lack brothers" and stating that she "[found] it strange that the colored women are the only two that can't see [that the defendants are guilty]" did not meet *Peña-Rodriguez* because the comments were directed at jurors, not at defendants, and thus upholding denial of motion for new trial without holding an evidentiary hearing); *Rosenthal*, 233 A.3d at 882, 885-86 (holding that the trial court did not abuse its discretion in denying motion for a new trial without holding a hearing after juror reported that other jurors told ethnic jokes and stories that cast people of Italian and Irish ancestry in a negative light, but the record did not establish that the defendant belonged to either of these ethnic groups, and there was no indication these jokes were directed towards the defendant or that jurors relied on them in reaching a verdict).

no-impeachment rule and the Sixth Amendment right to an impartial jury, and it is this high standard that we must therefore apply to P.F.'s allegations.[67]

Rumph spends the last few pages of his opening brief discussing the Washington Supreme Court's decision in *State v. Berhe*.[68] He argues that there are parallels between *Berhe* and this case, and, relying on the procedures adopted by the Washington court in *Berhe*, he asserts that the superior court should have held an evidentiary hearing to ensure that his claims of racial bias were "given full consideration with careful judicial oversight."

In *Berhe*, the Washington Supreme Court adopted procedures for trial courts in the state to follow when met with an allegation of racial bias in deliberations.[69] The need for these procedures arose after the existing procedure — allowing attorneys to speak directly with jurors after the jury was discharged — allowed counsel in *Berhe* to potentially taint the jurors by asking leading questions.[70] In particular, after a juror came forward to allege racial tension and animus affecting the verdict, and defense counsel contacted a majority of the remaining jurors, one of the jurors complained to the court.[71] The court informed all the jurors that, while they could reach out to the attorneys to discuss what happened during deliberations, the attorneys would be precluded from contacting them.[72] Six jurors contacted the prosecutor and answered a set of questions from the prosecutor that the supreme court later described as "pointed

---

[67] *Cf. Titus v. State*, 963 P.2d 258, 261-62 (Alaska 1998) (explaining that Alaska Evidence Rule 606(b) reflects a compromise between competing values).

[68] *State v. Berhe*, 444 P.3d 1172 (Wash. 2019).

[69] *Id.* at 1180-82.

[70] *Id.* at 1180.

[71] *Id.* at 1176.

[72] *Id.*

questions" that "were not designed to elicit the truth of whether racial bias was a factor in the verdict."[73]

On appeal, the Washington Supreme Court concluded that the trial court had failed to exercise adequate oversight or conduct a sufficient inquiry before denying the defendant's motion for a new trial.[74] Under the procedures adopted by the supreme court in *Berhe*, "once a claim of racial bias is raised, inquiries into the influence of that racial bias on a jury's verdict must be conducted under the court's supervision and on the record" (as opposed to having the inquiry controlled by the attorneys).[75] *Berhe* also announced a standard for when allegations of racial bias, including implicit racial bias, require a full evidentiary hearing: "whether an objective observer (one who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington State) could view race as a factor in the verdict. If there is a prima facie showing that the answer is yes, then the court must hold an evidentiary hearing."[76] But before deciding whether this *prima facie* showing has been met, the trial court is required to conduct a "thorough inquiry" (for example, by interviewing the complaining juror to obtain more information) if the evidence of racial bias is "unclear or equivocal, as it will often be in cases of alleged implicit racial bias."[77]

Rumph's reliance on *Berhe* is problematic for both substantive and procedural reasons. First, as a substantive matter, as we previously noted, Rumph has never argued that the Alaska Constitution requires an exception to the no-impeachment

---

[73]  *Id.* at 1177, 1180.

[74]  *Id.* at 1178.

[75]  *Id.* at 1180.

[76]  *Id.* at 1181.

[77]  *Id.* at 1182.

rule that is broader than *Peña-Rodriguez* and encompasses claims of implicit bias. He does not cite the Alaska Constitution's counterpart to the Sixth Amendment — Article I, Section 11 — and thus does not contend that this provision should be interpreted to provide more protection than the Sixth Amendment.[78] Without briefing on this point, it is unclear what our grounds would be for broadening *Peña-Rodriguez* or adopting the procedures set out in *Berhe*.

Moreover, in the superior court, Rumph did not cite to *Berhe* until his reply to the State's opposition to his motion for a new trial. Rumph acknowledged that "Alaska has yet to establish such [a] procedure [for inquiring into allegations of juror racial bias]," and he did not ask the court to do so. Rather, as in his opening brief on appeal, Rumph simply urged the court "to consider the Washington Supreme Court's firm stance on the importance of reviewing evidence related to allegations of racial bias during jury deliberations." In its written order, the trial court did not comment on *Berhe* or the *Berhe* procedure, concluding only that Rumph was not entitled to an evidentiary hearing or a new trial under the *Peña-Rodriguez* standard. We thus have no ruling on *Berhe* to review.[79]

To the extent Rumph is asking us to adopt new procedures for addressing post-verdict allegations by jurors of racial bias during deliberations, or to expand (under the Alaska Constitution) the racial bias exception to the no-impeachment rule, this claim is not preserved.

---

[78] We note that Washington has previously considered issues of implicit bias in other aspects of the criminal trial through the rule-making process. *See* Wash. Gen. R. 37(f) (expanding *Batson* challenges beyond intentional discrimination to include implicit bias).

[79] We also question whether the facts of *Berhe* are truly similar to this case, as Rumph alleges. In *Berhe*, the juror who came forward made specific allegations of racially based statements by other jurors that the Washington Supreme Court said went "beyond her 'subjective feeling.'" *Berhe*, 444 P.3d at 1183. But as we noted earlier, the same cannot be said of the affidavit here.

In any event, we note that, as the facts of this case demonstrate, Rumph's attorney was free to contact P.F. after trial, and vice versa; thus, Rumph's attorney could obtain the same information that a court could with the preliminary inquiry provided by *Berhe*.[80] Here, P.F. emailed Rumph's attorney with his concerns, and Rumph's attorney was entitled to interview P.F. and to provide the superior court with an affidavit from P.F. detailing his allegations, which she did. Rumph's attorney was free to contact P.F. for more details specifying whether racially biased statements were made by jurors during deliberations, but instead, all we have at this point is a relatively conclusory affidavit.

This is not to dismiss the value or merits of adopting procedures specific to this context, given the "unique historical, constitutional, and institutional concerns" presented by racial bias and the critical importance of ensuring equal treatment under the law.[81] As *Peña-Rodriguez* itself noted, even prior to that case, some courts had adopted their own exceptions for racial bias and outlined procedures for responding to

---

[80] Under Alaska Professional Conduct Rule 3.5(c), "After a jury is discharged, a lawyer may communicate with a juror, or a former, prospective, or alternate juror" unless an exception applies. For example, a lawyer may contact a juror after the jury is discharged unless "the communication is prohibited by law or a court order" or the juror has notified the lawyer that the juror does not wish to communicate. Alaska R. Prof. Cond. 3.5(c). During the communication, the lawyer may not engage in improper conduct, including "misrepresentation, coercion, duress, or harassment." Alaska R. Prof. Cond. 3.5(c) & cmt. Some jurisdictions more tightly control whether attorneys can interview jurors following a trial. *See, e.g.*, *United States v. Birchette*, 908 F.3d 50, 58 (4th Cir. 2018) (discussing Local Criminal Rule 24 for the Eastern District of Virginia, which precludes an attorney from interviewing a juror with respect to a verdict or deliberations in a criminal case "except on leave of Court granted upon good cause shown and upon such conditions as the Court shall fix").

[81] *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 224 (2017).

such claims.[82] The Washington Supreme Court's decision in *Berhe* sets forth one process for investigating these claims, and there may be considerable value in adopting a more inclusive definition of what constitutes racial animus for purposes of an Evidence Rule 606(b) exception.

But courts, including the United States Supreme Court in *Peña-Rodriguez*, have held that the decision whether to hold an evidentiary hearing in this context rests in the sound discretion of the trial court.[83] Rumph does not argue that a different standard of review should apply, nor does he explain why he would be entitled to an evidentiary hearing absent a threshold showing under *Peña-Rodriguez* which would allow consideration of the juror's testimony at an evidentiary hearing. We therefore conclude that the court did not abuse its discretion in failing to hold a hearing.

We nonetheless urge courts to be particularly sensitive and vigilant whenever it comes to the court's attention that a jury verdict may have been the result of racial prejudice and to err on the side of conducting an evidentiary hearing in order to "ferret out the truth."[84] Under *Peña-Rodriguez*, the question of whether the threshold showing allowing further inquiry has been satisfied is "a matter committed to the

---

[82] *Id.* at 218, 227; *see, e.g.*, *State v. Santiago*, 715 A.2d 1, 21 (Conn. 1998); *Kittle v. United States*, 65 A.3d 1144, 1152 (D.C. 2013); *After Hour Welding, Inc. v. Laneil Mgmt. Co.*, 324 N.W.2d 686, 690 (Wis. 1982).

[83] *Peña-Rodriguez*, 580 U.S. at 225-26 ("Whether th[e] threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence."); *see also Commonwealth v. Rosenthal*, 233 A.3d 880, 886 (Pa. Super. 2020) (applying abuse of discretion standard in evaluating whether further inquiry into jurors' alleged racial comments during deliberations was warranted).

[84] *After Hour Welding, Inc.*, 324 N.W.2d at 690 (stating that when a trial court becomes aware that a jury verdict may have resulted from racial prejudice, "judges should be especially sensitive to such allegations and conduct an investigation to 'ferret out the truth'").

substantial discretion of the trial court in light of all the circumstances."[85] But this litigation must occur in the first instance in the trial court.

Here, given the conclusory nature of P.F.'s affidavit and the absence of detail regarding whether statements were made and their contents, we conclude that the court did not abuse its discretion in finding that P.F.'s affidavit did not meet the required showing set out in *Peña-Rodriguez*.

*The allegation of improper reliance on the juror's acquaintance with witness Allridge*

As we discussed above, Allridge was called as a defense witness to provide opinion and reputation testimony about Owens based on Allridge's time as a correctional officer at the Anchorage Correctional Complex, where Owens had been an inmate. Rumph's attorney tailored her questions to keep the jury from knowing that Owens had been in custody. Allridge testified as follows:

> *Defense attorney*: . . . There was a period of time that you and Mr. Owens were in the same community?
>
> *Allridge*: Yes.
>
> *Defense attorney*: Do you know whether or not Mr. Owens had a reputation for being violent?
>
> *Allridge*: Yes.
>
> *Defense attorney*: And his reputation in that community was that he was violent?
>
> *Allridge*: Yes.

P.F.'s affidavit alleged that one of the jurors was acquainted with Allridge and that this juror invited the jury to speculate about facts that were not in evidence. On this point, P.F.'s affidavit reads:

> During deliberations, one of the jurors told the panel that he knew one of the witnesses, Christopher Allridge. He

---

[85] *Peña-Rodriguez*, 580 U.S. at 226.

reported to the jury that Mr. Allridge was normally a "very jovial" person and his behavior on the stand was abnormal. He told the jury that: 1) Mr. Allridge worked for the Department of Corrections; 2) Mr. Allridge's opinion of Mr. Owens was most likely based on an "incident report" while Mr. Owens was in jail; 3) Mr. Allridge acted the way he did on the stand because the defense subpoenaed him to be there. That juror may have been considered by other jurors as an "expert" and he was providing outside information to help them judge Mr. Allridge's credibility beyond what was in the jury instruction. I believe that affected the jury's verdict.

Evidence Rule 606(b) exempts from the no-impeachment rule "extraneous prejudicial information" on the basis that the defendant has a right to know and to confront the evidence against them.[86] In Alaska, this right can conflict with the defendant's right to be tried in the locality of the crime; when communities are small and isolated, jurors may know the parties or witnesses.[87]

In *Titus v. State*, the Alaska Supreme Court held that the phrase "extraneous prejudicial information" under Evidence Rule 606(b) "includes only knowledge of specific facts surrounding the alleged crime and the defendant's connection to it" and not "general background knowledge about the defendant or the charge."[88] Here, the superior court found that the juror's professed knowledge about Allridge — that he worked for the Department of Corrections and that he normally had a jovial demeanor — is "general background knowledge," and not the sort of specific knowledge about the alleged crime and the defendant's connection to it that constitutes "extraneous prejudicial information" under Evidence Rule 606(b).

---

[86] *Titus v. State*, 963 P.2d 258, 262 (Alaska 1998).

[87] *Id.* at 262-63.

[88] *Id.* at 263.

But even assuming this information fell within an exception to Evidence Rule 606(b), there is little reason to believe (as the superior court also noted) that the juror's speculation that Owens had an incident report from his time at the jail, which led Allridge to believe that he was violent, would harm Rumph's case. To the contrary, it would tend to support Rumph's self-defense claim by showing that Owens had been incarcerated and arguably had a tendency toward violence.

Thus, any error in the superior court's ruling that the information regarding Allridge contained in P.F.'s affidavit was inadmissible is harmless.

*Speculation about judicial resources*

Finally, Rumph contends that jurors speculated about the financial resources that had already been committed to his trial and the consequences of a hung jury. P.F.'s affidavit asserts: "One juror said that the jury should consider the financial burden the state has incurred, the likelihood of the case not being retried, and the consequences of a guilty person getting set free."

While these considerations are improper, Evidence Rule 606(b) precludes jurors from "testify[ing] that they disregarded the court's instructions or were pressured by other jurors into returning a verdict they really did not believe in."[89] In short, juror speculation about the resources spent on the trial and the consequences of a hung jury does not constitute "extraneous prejudicial information" for purposes of Rule 606(b), and further inquiry into this matter was barred by the rule.[90]

---

[89] *Kehlenbach v. State*, 1992 WL 12153253, at *11 (Alaska App. Aug. 19, 1992) (unpublished).

[90] *See Thomas v. State*, 377 P.3d 939, 950 (Alaska 2016) (concluding that the trial court did not abuse its discretion in denying motion for an evidentiary hearing or new trial where none of the juror's post-verdict allegations about statements made during deliberations fell within an exception to Evidence Rule 606(b)).

*Conclusion*

The judgment of the superior court is AFFIRMED.